773 A.2d 1121

ALBAN WILSON, CHARLES A. MEYER, AND RICHARD S. LOE-
BER, PLAINTIFFS-APPELLANTS, v. AMERADA HESS CORPO-
RATION AND LEON HESS, DEFENDANTS-RESPONDENTS,
AND JOHN DOES 1 THROUGH 20, AND ABC CORPORATIONS 1
THROUGH 20, DEFENDANTS.

Argued October 24, 2000—Decided June 14, 2001.

238

*Edward J. Nolan* argued the cause for appellants, (*Brian N. Lokker* and *Edward J. Nolan*, attorneys; *Mr. Nolan* and *Mr. Lokker*, of counsel and on the briefs).

*Roger B. Kaplan* argued the cause for respondents, (*Wilentz, Goldman & Spitzer*, attorneys; *Mr. Kaplan* and *Richard J. Byrnes*, on the brief).

The opinion of the Court was delivered by

LaVECCHIA, J.

Plaintiffs, three independent franchise dealers of Hess gasoline, maintain that defendant, Amerada Hess Corporation, violated the implied covenant of good faith and fair dealing in setting gasoline prices notwithstanding a provision in the contract giving defendant unilateral authority to set and change dealer tank wagon (DTW) prices. The trial court granted defendant summary judgment. The Appellate Division affirmed because giving plaintiffs every favorable inference, the record was devoid of evidence to suggest that Hess's "DTW prices were established with any bad faith motive to deprive plaintiffs of any profit," or that "the terms offered to other stations interfere with plaintiffs' right to earn a profit."

Plaintiffs contend that they were denied the opportunity to produce circumstantial evidence of bad faith in Hess's setting of gas prices because certain discovery was denied to them and that therefore summary judgment was premature. We granted certification, 165 *N.J.* 525, 760 *A.*2d 780 (2000), limiting our review solely to plaintiffs' claim of breach of the implied covenant of good faith and fair dealing. We now reverse and remand for additional discovery and further proceedings.

I.

■ We emphasize at the outset that the allegation against defendant Hess is simply that: an unproven allegation. Because this case was disposed of on a motion for summary judgment, our review is based on consideration of the evidence in the light most favorable to plaintiffs. *Brill v. Guardian Life Ins. Co.*, 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995). Further, we recite only those facts germane to plaintiffs' claim of breach of the implied covenant.

Hess is an integrated oil company that produces, refines, and distributes gasoline and other petroleum products. The company sells gasoline and other fuel products to the public at retail under its Hess brand, both through independent franchise dealers and through gasoline stations owned and operated directly by Hess.

Plaintiffs Meyer, Wilson, and Loeber have been Hess independent franchise dealers since 1968, 1972, and 1977, respectively. At all times relevant to this lawsuit, each of the plaintiffs has operated his respective station under a Dealership Agreement with Hess. The Dealership Agreements serve both as franchise agreements and as station leases.

Hess's use of independent franchise dealers has changed over time. In the early 1970s, approximately 95% of all Hess gasoline stations were owned and operated by independents. The record submissions inform us that as of March 1998 the number of Hess gasoline stations had grown to 541, of which approximately 82% were Hess operated (co-op stations) and the remaining 18% were operated by independent franchise dealers.

The Hess approach to its independent franchise dealers' profitability initially was to promote high-volume gasoline sales based on low prices. Hess would sell the gasoline to its dealers, setting the retail price significantly below the price charged by major national brands and allowing a reasonable profit margin to its dealers. Its marketing emphasized clean gasoline stations and friendly servers who sold primarily gasoline and few peripheral items. The Hess dealers did not service automobiles.

In the early 1980s, Hess abandoned its practice of setting the retail price charged by its dealers. Instead, Hess sold gasoline to its dealers at a wholesale cost based on the DTW prices in the marketing area of the dealer's stations as determined by Hess. Hess sets and adjusts its DTW prices by reference to the current retail gasoline prices charged by certain other retailers selected by Hess in each dealer's local area, including retailers of major brands. The DTW prices provided to the dealers are set at a rate based on the subtraction of a certain amount per gallon from the current retail gasoline prices in each dealer's local area. Thus, Hess allows its dealers a mark-up of an amount equal to that differential. The precise amount of the differential will not be disclosed here because it is protected by a confidentiality agreement.

A provision of the Dealership Agreement concerning price of gasoline reads:

Prices to the Dealer will be: (a) for motor fuel and kerosene, Hess's dealer tank wagon [DTW] prices in the marketing area of the Station, as determined by Hess, for the grades and quantities delivered, in effect at the time of delivery.... All prices are subject to change at any time without notice....

Further, the Dealership Agreement provides the following disclaimer on the part of Hess:

Dealer acknowledged that Hess had made no representations and provided no estimates as to the following:

a. Potential income to the Dealer from the Station's business.

b. Prospects for success of the Station's business.

c. Possible training and management assistance by Hess to Dealer.

d. Volume of HESS Fuel or other products which Dealer will be able to sell at the Station.

Plaintiffs contend that through its DTW pricing practices, Hess controls the revenue available to dealers to cover operating expenses and provide profit. However, plaintiffs complain that after the gasoline is marked up by the dealer to cover operating costs and provide profit, the resulting posted prices are comparable to the major brands and substantially higher than unbranded gasoline stations. Thus, they allege that Hess's DTW pricing practices have reduced the ability of its dealers to generate high-volume sales of gasoline through low prices. The dealers maintain that they cannot compete with the major brands when posting comparable retail prices. The major brands have long-standing advantages that can offset high retail prices, such as nationwide credit card acceptance, national advertising programs, sales of tires, batteries, accessories, and in many instances, repair bays and convenience stores. The dealers, on the other hand, are severely limited through the Dealership Agreements in their ability to provide those services.

As a result of Hess's DTW pricing practices, the dealers have lost their traditional market, and plaintiffs contend that they have been unable to operate profitable businesses. The plaintiffs have either lost business due to unprofitability or maintained their

businesses only by investing substantial personal funds. Wilson left the business in October 1995.

Importantly, plaintiffs assert that Hess operates its co-op stations with pricing policies that permit higher operating expenses than its dealers can sustain under its DTW pricing practices. Thus, plaintiffs contend that Hess knowingly sets its DTW prices at a level that will not allow the dealers to cover operating expenses and achieve profit. Further, Hess has provided cash subsidies and sold gasoline at reduced prices to certain franchise dealers other than plaintiffs through its dealer assistance program. Plaintiffs claim that that preferential pricing practice bolsters its assertion that Hess knows that its DTW pricing prevents plaintiffs from operating their franchises profitably.

Prior to the trial court's grant of summary judgment to Hess on plaintiffs' claim for breach of the implied covenant of good faith and fair dealing, the court denied plaintiffs' motion to compel the production of documents examining the performance of both Hess co-op stations and stations in Hess's dealer assistance program located in the marketing areas of plaintiffs' stations. Specifically, plaintiffs requested any reports that Hess prepared to evaluate, analyze, and review plaintiffs' stations, the dealer assistance program stations, and the co-op stations in plaintiffs' marketing area related to performance, costs, volume, margins, and profits. Plaintiffs contend that that information would have shown that Hess knew that based on certain costs involved with operating their own stations, the dealer franchise could not be sustained under the new DTW pricing practices and the resultant reduced volume of sales that Hess's pricing caused. That is especially true, plaintiffs claim, in light of the indisputable fact that since the early 1980s Hess stations have gone from being predominantly run by independent franchisees, to being Hess run. That is information, plaintiffs assert, that should have been examined before the court ruled on defendant's motion for summary judgment on the good faith and fair dealing claim.

## II.

■ A covenant of good faith and fair dealing is implied in every contract in New Jersey. *Sons of Thunder, Inc. v. Borden, Inc.*, 148 *N.J.* 396, 420, 690 *A.*2d 575 (1997) (citing numerous cases of this Court holding covenant implied in every contract). That covenant is among the few terms that "[c]ourts have been called upon to supply." E. Allan Farnsworth, *Contracts* § 1.5, at 12–14 (1990).

■ Implied covenants are as effective components of an agreement as those covenants that are express. *Aronsohn v. Mandara*, 98 *N.J.* 92, 100, 484 *A.*2d 675 (1984). Although the implied covenant of good faith and fair dealing cannot override an express term in a contract, a party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent express term. *Sons of Thunder, Inc., supra*, 148 *N.J.* at 419, 690 *A.*2d 575. Unlike many other states, in New Jersey "a party to a contract may breach the implied covenant of good faith and fair dealing in performing its obligations even when it exercises an express and unconditional right to terminate." *Id.* at 422, 690 *A.*2d 575; *see also Bak–A–Lum Corp. v. Alcoa Bldg. Prods., Inc.*, 69 *N.J.* 123, 129–30, 351 *A.*2d 349 (1976) (finding that defendant's conduct in terminating contract constituted bad faith although conduct did not violate express terms of written agreement); *cf. Burger King Corp. v. Weaver*, 169 *F.*3d 1310, 1316 (11th Cir.1999) (finding that under Florida law action for breach of implied covenant of good faith and fair dealing cannot be maintained in absence of breach of express contract provision); *Payne v. McDonald's Corp.*, 957 *F.Supp.* 749, 758 (D.Md.1997) (determining that under Illinois law covenant of good faith and fair dealing does not provide independent source of duties). Other jurisdictions regard the implied covenant of good faith and fair dealing as merely a guide in the construction of explicit terms in an agreement. *See Payne, supra*, 957 *F.Supp.* at 758 (citing *Beraha v. Baxter Health Care Corp.*, 956 *F.*2d 1436, 1443 (7th Cir.1992)).

What constitutes good faith performance and fair dealing has been the subject of considerable analysis. For transactions involving merchants and the sale of goods, the Uniform Commercial Code has defined good faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." *N.J.S.A.* 12A:2–103(1)(b). The Restatement (Second) of Contracts notes that every contract imposes on each party a duty of good faith and fair dealing in its performance and enforcement. *Restatement (Second) of Contracts* § 205 (1981). A comment to the Restatement states that "[g]ood faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." *Restatement (Second) of Contracts* § 205 comment a (1981). In *Sons of Thunder, Inc., supra,* we reaffirmed our earlier formulation:

In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; which means that in every contract there exists an implied covenant of good faith and fair dealing.

[148 *N.J.* at 421, 690 *A.*2d 575 (quoting *Palisades Properties, Inc. v. Brunetti,* 44 *N.J.* 117, 130, 207 *A.*2d 522 (1965))(citing 5 *Williston on Contracts* § 670, at 159–60 (3d ed.1961)).]

This Court's earlier decisions concerning the implied covenant have not involved contracts that vested unilateral discretion to set a price in one party. *Bak–A–Lum Corp., supra,* 69 *N.J.* at 123, 351 *A.*2d 349, and *Sons of Thunder, Inc., supra,* 148 *N.J.* at 396, 690 *A.*2d 575, involved bad faith in the context of a party's contractual right to terminate. *Palisades Properties, Inc., supra,* 44 *N.J.* at 117, 207 *A.*2d 522, and *Onderdonk v. Presbyterian Homes,* 85 *N.J.* 171, 425 *A.*2d 1057 (1981), concerned the implied covenant of good faith and fair dealing in the context of determining the parties' rights and duties on matters concerning which the contract was silent. Here we are confronted with the question of the appropriate force of the implied covenant of good faith and fair dealing in reviewing the actions of a contracting party expressly

vested with unilateral discretionary authority over pricing. Stated differently, the task here is to identify in that context the parties' reasonable expectations.

In his widely cited law review article, Professor Steven J. Burton discusses the implied covenant of good faith and fair dealing in respect of contracts authorizing one party to have the discretion to make decisions as to quantity, price, time, and other conditional aspects of a contract. Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 *Harv. L.Rev.* 369 (1980). Professor Burton comments that decisions concerning price that are deferred to the discretion of one of the parties must be made in good faith. *Id.* at 381–82. He explains that "[a] party with discretion may withhold all benefits for good reasons.... The fact that a discretion-exercising party causes the dependent party to lose some or all of its anticipated benefit from the contract thus is insufficient to establish a breach of contract by failing to perform in good faith." *Id.* at 384–85. A good faith performance doctrine may be said to permit the exercise of discretion for any purpose—including ordinary business purposes—reasonably within the contemplation of the parties. *Id.* at 385–86. It follows, then, that "[a] contract thus would be breached by a failure to perform in good faith if a party uses its discretion for a reason outside the contemplated range—a reason beyond the risks assumed by the party claiming the breach." *Id.* at 386.

Professor Burton's approach respects the express bargain of parties that gave unilateral authority over price to one party alone. That approach also requires that the discretion-exercising party not unilaterally use that authority in a way that intentionally subjects the other party to a risk beyond the normal business risks that the parties could have contemplated at the time of contract formation. In this manner,

[t]he good faith performance doctrine may be said to enhance economic efficiency by reducing the costs of contracting. The costs of exchange include the costs of gathering information with which to choose one's contracting partners, negotiating and drafting contracts, and risk taking with respect to the future. The good faith

performance doctrine reduces all three kinds of costs by allowing parties to rely on the law in place of incurring some of these costs.

[*Id.* at 393.]

In the same vein, various courts have stated that a party must exercise discretion reasonably and with proper motive when that party is vested with the exercise of discretion under a contract. *Beraha, supra,* 956 *F.*2d at 1443 (finding implied covenant of good faith and fair dealing limits controlling party's discretion; controlling party must exercise discretion reasonably with proper motive, not arbitrarily, capriciously, or in manner inconsistent with reasonable expectations of parties); *Carvel Corp. v. Diversified Mgmt. Group, Inc.,* 930 *F.*2d 228, 232 (2d Cir.1991) (stating that even if controlling party acted within bounds of discretion, controlling party would be in breach of implied covenant if it acted unreasonably); *Amoco Oil Co. v. Ervin,* 908 *P.*2d 493, 499 (Colo. 1996) (finding implied covenant of good faith and fair dealing violated when discretion exercised unreasonably and with bad motive notwithstanding that one party has discretionary authority to determine rental charges under terms of contract); *Abbott v. Amoco Oil Co.,* 249 *Ill.App.*3d 774, 189 *Ill.Dec.* 88, 619 *N.E.*2d 789, 795 (1993) (observing that duty of good faith and fair dealing limits manner of exercise of discretion by party vested with discretion; discretion must be exercised reasonably with proper motive, not arbitrarily, capriciously, or inconsistent with reasonable expectations of parties). Examination of several cases testing the reasonableness of the exercise of the unilateral discretion to set price is helpful to our consideration here.

In *Abbott, supra,* 189 *Ill.Dec.* 88, 619 *N.E.*2d at 791, the Illinois Court of Appeals considered whether Amoco violated the implied covenant of good faith and fair dealing in setting prices of gasoline for its dealers. The Dealer Supply Agreement between Amoco and its dealers provided:

The price for motor fuels purchased by Dealer from Amoco, hereunder, shall be Amoco's dealer buying price for each respective grade of said products in effect in Amoco's pricing area in which the above identified motor fuel sales facility is located at the time when title to said products passes from Amoco to Dealer.

[*Ibid.*]

Amoco implemented a discount for gas program. The dealers alleged that under the program Amoco made them pay a credit card fee for each Amoco credit card purchase occurring at the dealer's respective stations. *Ibid.* They also alleged that Amoco promised that it would discount the cost of gas to reflect the removal of the credit card fee from the gas prices. *Ibid.* Amoco, however, never realistically provided for the promised discounts. *Ibid.* The trial court dismissed the dealer's breach of the implied covenant of good faith and fair dealing claim, finding that the contract gave Amoco the discretion to set gas prices and that Illinois law did not recognize a cause of action for breach of the implied covenant of good faith and fair dealing. *Id.* 189 *Ill.Dec.* 88, 619 *N.E.*2d at 793.

On appeal, the dealers argued that because the price term was open in the contract, "Amoco was bound to calculate the price in a manner consistent with the parties' expectations in entering into their relationship—that they would both make a profit." *Id.* 189 *Ill.Dec.* 88, 619 *N.E.*2d at 795. That argument was rejected. *Id.* 189 *Ill.Dec.* 88, 619 *N.E.*2d at 796. The court reasoned that where Amoco was permitted under the contract to set the price, and both parties sought to maximize their profits, any increase in price by Amoco will affect the dealers adversely and "[t]hus, the dealers cannot complain when Amoco merely exercises the discretion the dealers allowed Amoco to possess." *Ibid.* The court noted that the dealers never alleged that Amoco acted unfairly or in bad faith in setting its gasoline prices, nor did they allege that they had been placed in financial trouble, that the prices were out of line with other oil companies, or that Amoco could not have had a legitimate business reason for its actions. *Ibid.*

Similarly, in *Adams v. G.J. Creel and Sons, Inc.*, 320 *S.C.* 274, 465 *S.E.*2d 84, 85 (1995), plaintiff dealer contracted to purchase gas from defendant Creel. The contract did not include an agreed upon price. *Id.* at 86. The dealer sued, claiming that defendant breached its implied covenant of good faith and fair dealing for failing to sell her gasoline at defendant's lowest price. *Id.* at 85.

The Supreme Court of South Carolina affirmed the trial court's grant of summary judgment to defendant. *Ibid.* The court stated that there can be no breach of the implied covenant of good faith and fair dealing where a party to the contract has done what the provisions of the contract allow. *Ibid.* The court found that although plaintiff showed that defendant sold gas to others at a better price, plaintiff had failed to show that defendant breached the contract. Plaintiff even admitted that, under the contract, defendant did not agree to sell her gas at the lowest price charged to other customers. *Ibid.* That defendant may have sold less expensive gas to others did not amount to a breach of contract. *Ibid.* Because defendant did what the contract expressly allowed him to do, there could be no breach of the implied covenant of good faith and fair dealing. *Id.* at 86.

Both *Abbott* and *Adams* highlight the importance of demonstrating bad motive in order to assert successfully a claim of breach of the implied covenant of good faith and fair dealing. The decision in *Amoco Oil Co. v. Ervin, supra,* 908 *P.*2d at 493, provides an instance where such a claim was asserted successfully because bad motive was demonstrated. In *Ervin,* Amoco was sued by its dealers for breach of the implied covenant of good faith and fair dealing in its setting of rental charges. *Id.* at 495. Originally, Amoco calculated the rent owed by its dealers based on the sale of gasoline. *Ibid.* When Amoco realized that such a basis provided the dealers with a disincentive to sell more gasoline, the company instituted an asset-based rental program. *Id.* at 495–96. Under that program, Amoco added the market value of the land, appraised at its best use, to the value of capital improvements to determine investment base. Amoco then charged eight percent of the investment base in calculating a dealer's capital charge. *Id.* at 496. In addition, Amoco charged its dealers for each automotive service bay, despite including the buildings, machinery, and equipment in the capital improvement calculation. *Ibid.*

The dealers claimed that Amoco breached the implied covenant by employing a rental formula that involved double charging. *Id.* at 497. A jury found for the dealers, and on appeal, the Colorado Supreme Court affirmed, agreeing that the duty of good faith and fair dealing applies even when one party has discretionary authority to determine certain terms of the contract, such as the quantity, price, or time. *Id.* at 499. The court stated that whether a party acted in good faith is a question of fact to be determined on a case-by-case basis, and the record demonstrated that Amoco was aware of the double charging to its dealers. *Ibid.* The implied covenant of good faith and fair dealing was breached, therefore, because the dealers were justified in expecting that they would not be double charged intentionally for any element of the calculation. *Ibid.*

■ Accordingly, when considering whether Hess breached the implied covenant, we must respect and give effect to the parties' bargain as expressed in the contract, that is, the right of Hess to set the price of gasoline sold to its dealers. *See Cruz–Mendez v. ISU/Ins. Servs.*, 156 *N.J.* 556, 570, 722 *A.*2d 515 (1999) (stating parties intent revealed by language used). But the discretion afforded to Hess is not unbridled discretion. Hess's performance under the contract is tempered by the implied covenant of good faith and fair dealing and the reasonable expectations of the parties.

■ As stated recently in *Emerson Radio Corporation v. Orion Sales Inc.*, 80 *F.Supp.*2d 307 (D.N.J.2000), *rev'd in part on other grounds*, 253 *F.*3d 159 (3rd Cir.2001), a thoughtful opinion summarizing our case law on the reasonable expectations of a contracting party when a contingency is under the unilateral control of the other party to the contract:

> [W]here a party alleges frustration of its expectation or fundamental purpose in entering the contract, the question of what interest will be protected by the implied duty answers itself; the plaintiff's interest is internal to the understanding of the parties and good faith requires the defendant not exercise such discretion as it may have under the literal terms of the contract to thwart plaintiff's expectation or purpose.
>
> [*Id.* at 314.]

■ Here, to give full effect to the express term, we state the test for determining whether the implied covenant of good faith and fair dealing has been breached as follows: a party exercising its right to use discretion in setting price under a contract breaches the duty of good faith and fair dealing if that party exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract. Such risks clearly would be beyond the expectations of the parties at the formation of a contract when parties reasonably intend their business relationship to be mutually beneficial. They do not reasonably intend that one party would use the powers bestowed on it to destroy unilaterally the other's expectations without legitimate purpose.

■ At the same time, the test must recognize the mutuality of expectation and enforce a party's contractual right to exercise discretion in setting prices based on its own reasonable beliefs concerning business strategy. In that setting, an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent improper motive. *See Emerson Radio Corp., supra,* 80 *F.Supp.*2d at 311 ("[T]he [New Jersey] cases note a state of mind or malice-like element to breach of good faith and fair dealing, holding that the duty excludes activity that is unfair, not decent or reasonable, nor dishonest."); *see also Black Horse Lane Assoc. v. Dow Chem. Corp.,* 228 *F.*3d 275, 288 (3d Cir.2000) (same). Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance. *See, e.g., Abbott v. Amoco Oil Co., supra,* 189 *Ill.Dec.* 88, 619 *N.E.*2d at 796; *Adams v. G.J. Creel and Sons, Inc., supra,* 465 *S.E.*2d at 85–86. Bad motive or intention is essential, for, as stated by the United States Court of Appeals for the Seventh Circuit, "[c]ontract law does not require parties to behave altruistically toward each other; it does not proceed on the philosophy that I am my brother's keeper." *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.,* 970 *F.*2d

273, 280 (7th Cir.1992) (holding that franchiser may not use contractually provided discretion arbitrarily or capriciously to place franchisee in detriment; franchiser's decisions must be justified as honest, legitimate business decisions); *see also JRT, Inc. v. TCBY Sys., Inc.*, 52 *F.*3d 734, 736 (8th Cir.1995) (requiring franchisee to show "objectively ascertainable proof of intentional bad faith"); *Hengel, Inc. v. Hot 'N Now, Inc.*, 825 *F.Supp.* 1311, 1323 (N.D.Ill.1993) (finding franchiser may not exercise discretion in arbitrary and capricious manner); *Bonfield v. AAMCO Transmissions, Inc.*, 708 *F.Supp.* 867, 885 (N.D.Ill.1989) (finding duty of good faith requires discretion to be exercised reasonably and with proper motive).

## III.

The question remaining is whether plaintiffs had a full opportunity to show bad motive on Hess's part before Hess was granted summary judgment. Plaintiffs claim that they were denied information that would provide circumstantial evidence of lack of good faith. Plaintiffs' bad faith claim is that Hess set its DTW prices with the specific intent to impair the ability of the dealers to compete in the gasoline market or, alternatively, to discourage the franchisees from continuing in the business in order to replace them with Hess co-op stations.

Plaintiffs moved to compel the production of documents showing the performance, costs, volumes, margins, and profits of the Hess co-op stations and DAP stations in the marketing areas of plaintiffs' stations. They contend that those documents would have shown that Hess knew that based on the necessary operating costs involved with running plaintiffs' stations, plaintiffs could not sustain their businesses on the pricing differential allowed and the resultant decreased sales volume. Plaintiffs contend that that information, in conjunction with information showing that, since the 1980s, Hess stations have changed from being predominantly run by franchisees to predominantly Hess-run, would create a jury question concerning whether Hess acted with an improper motive.

Plaintiffs' requested discovery was denied by the trial court. Although deference is generally accorded to the trial court on such matters, *see Connolly v. Burger King Corp.*, 306 *N.J.Super.* 344, 349, 703 *A.*2d 941 (App.Div.1997) (stating that abuse of discretion standard applies to review of decision regarding discovery), in this instance we cannot dismiss the possibility that the information plaintiffs sought would raise a jury question on the issue of breach of the implied covenant.

 In that respect, we note that the Appellate Division applied a standard of good faith and fair dealing that comported with our view, as expressed today. The Appellate Division stated:

> Because the implied covenant of good faith and fair dealing applies to the parties' performance under the contract notwithstanding the provision in the contract permitting Hess to set and change DTW prices, the issue is whether, viewing the evidence presented in a light most favorable to plaintiffs, Hess, in setting gasoline prices, acted in bad faith or violated any commercially reasonable standard thereby depriving plaintiffs of their right to make a reasonable profit.

We part company with the Appellate Division, however, in respect of its conclusion that the further discovery sought by plaintiffs was unlikely to lead to the discovery of relevant evidence on the question of breach by Hess. Here, the contention is that Hess set prices intending to destroy plaintiffs economically. Although that allegation may be difficult to prove, our province is not to decide questions of fact, but only to determine whether sufficient information has been presented to warrant a jury determination. A corollary of that principle is that a plaintiff must have a reasonable opportunity to obtain facts not available to it other than through formal discovery.

 Plaintiffs assert that the information they seek should compel a jury inference that Hess set out to destroy them by pricing its DTW as it did, based on its knowledge of operational expenses in its own co-op stations and distressed stations in plaintiffs' market area. The information denied to plaintiffs allegedly would have disclosed facts with which, plaintiffs contend, they can demonstrate circumstantial evidence of lack of good faith—indeed, bad motive—entitling them to a jury trial. That evidence

of bad motive may be established through circumstantial evidence cannot be disputed, for "it has been recognized that one's state of mind is seldom capable of direct proof and ordinarily must be inferred from the circumstances properly presented and capable of being considered by the court." *Amerada Hess Corp. v. Quinn,* 143 *N.J.Super.* 237, 249, 362 *A.*2d 1258 (Law Div.1976). This Court has approved the observation that "'[w]hat a person's intentions were need not be proved from what he said, but they may be inferred from all that he did and said, and from all the surrounding circumstances of the situation under investigation." *Mayflower Indus. v. Thor Corp.,* 15 *N.J.Super.* 139, 162, 83 *A.*2d 246 (Ch.Div.1951), *aff'd o.b.,* 9 *N.J.* 605, 89 *A.*2d 242 (1952). Thus, where state of mind must be inferred from circumstantial evidence, the standard is whether the evidence is of a quality "'sufficient to generate belief that the tendered hypothesis is in all human likelihood the fact.'" *Amerada Hess Corp. v. Quinn, supra,* 143 *N.J.Super.* at 249, 362 *A.*2d 1258 (quoting *Ciuba v. Irvington Varnish & Insulator Co.,* 27 *N.J.* 127, 139, 141 *A.*2d 761 (1958)).

We cannot say, without the benefit of that discovery they were denied, that plaintiffs' contentions are meritless and that defendant is entitled to summary judgment. If the discovery plaintiffs seek demonstrates that Hess knew from the operations of its own co-op stations and the distressed stations that its DTW pricing rendered it impossible for plaintiffs to meet their operating expenses and perform profitably, and unless Hess provides an explanation for its pricing that is not arbitrary, capricious, or unreasonable, then plaintiffs will have established a jury question on their claim for breach of the implied covenant of good faith and fair dealing. Accordingly, we remand this matter to the trial court for that additional discovery.

## IV.

We reverse the grant of summary judgment in favor of defendant and remand the matter to the Law Division for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—None.