

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-9-2007

# Buck Consul Inc v. Glenpointe Assoc

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-4685

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Buck Consul Inc v. Glenpointe Assoc" (2007). *2007 Decisions.* Paper 1638.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1638

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-4685
_____

BUCK CONSULTANTS, INC.

v.

GLENPOINTE ASSOCIATES,
Defendant/Third-Party Plaintiff

v.

MELLON FINANCIAL CORPORATION,
Third-Party Defendant

Glenpointe Associates,
Appellant
_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 03-00454)
District Judge: Jose L. Linares
_____

Argued November 28, 2006

Before: RENDELL and AMBRO, Circuit Judges
PRATTER,* District Judge

(Filed February 9, 2007)

_____

  *Honorable Gene E.K. Pratter, United States District Judge for the Eastern District of
Pennsylvania, sitting by designation.

John J. Gibbons    **[ARGUED]**
Gibbons, Del Deo, Dolan,
Girffinger & Vecchione
One Riverfront Plaza
Newark, NJ  07102-5497

Michael S.  Meisel
David M.  Kohane
Cle, Schotz, Meisel, Forman & Leonard
25 Mian Street - Court Plaza North
P.O. Box 800
Hackensack, NJ  07601
   *Counsel for Appellant*

B.  John Pendleton, Jr.    **[ARGUED]**
McCarter & English
100 Mulberry Street
Four Gateway Center
Newark, NJ  07102-0652
   *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

PRATTER, <u>District Judge</u>.

Glenpointe Associates ("Glenpointe") has appealed the District Court's summary

judgment in favor of Glenpointe's tenant, Buck Consultants, Inc. ("Buck"), in which the

District Court found that Glenpointe unreasonably, and in bad faith, refused Buck's

request that Glenpointe consent to a proposed sublease between Buck and Eisai

Corporation of North America ("Eisai").

For the reasons discussed below, we will reverse the District Court's finding that

2

Glenpointe acted in bad faith. We also find that it was error for the District Court to order that the lease in question was terminated in its entirety.

## I. FACTUAL BACKGROUND

On November 18, 1998, Glenpointe leased 70,000 square feet of office space to PriceWaterhouse Coopers, LLP ("PWC") at Glenpointe Centre West ("Glenpointe West"), in Teaneck, New Jersey (the "Lease").[1] The Lease term extended to February 28, 2009. In January 2002, with the consent of Glenpointe, PWC assigned the Lease to EBS Acquisition Corporation ("EBS"), a wholly owned subsidiary of Mellon Financial Corporation ("Mellon"). Six months later, EBS assigned the Lease to Buck, another Mellon affiliate.

Under the terms of the Lease, Buck was responsible for annual fixed rent payments in the amount of $1,992,777 for the first five years of the Lease, and $2,272,465 annual fixed rent thereafter. In addition, Buck was responsible for its proportionate share of operating expenses and real estate taxes. Accordingly, Buck made monthly rent payments totaling $173,377.79, including $166,044.75 in fixed rent and $7,313.04 in additional rent obligations.

The Lease contains multiple provisions that, when taken together, govern Buck's ability to assign or sublease the premises. Paragraph 11 of the Lease states, in pertinent part:

_____

[1] Glenpointe West is a 330,000 square foot, seven-story office building.

3

(A) Tenant, for itself . . . successors and assigns, expressly covenants that it shall not assign, mortgage or encumber this Lease, nor underlet, or suffer or permit the demised premises of any part thereof to be used by others, without the prior written consent of Landlord in each instance, as hereinafter set forth.

Paragraph 27(J) of the Lease provides the guidelines for Glenpointe's consent:

(1)(a) Whenever Landlord's consent or approval is required under the Lease, Landlord agrees that such consent or approval shall not be unreasonably withheld or delayed at such times as Tenant is not in default in the performance of any of its obligations under this Lease after notice and the expiration of any applicable cure periods provided herein. This subsection J(1) shall not apply to any provision in this Lease which expressly permits Landlord to arbitrarily withhold its consent or approval.

(2) If in this Lease, it is provided that Landlord's consent or approval as to any matter will not be unreasonably withheld, and it is established by a court or body having final jurisdiction thereover that Landlord has been unreasonable, the only effect of such finding shall be that Landlord shall be deemed to have given its consent or approval; it being understood and agreed that in no event . . . shall Landlord be liable to Tenant in any respect for money damages by reason of withholding its consent, unless such court or body specifically determines that Landlord had acted in bad faith or maliciously . . . and in no event shall Landlord be liable for consequential or punitive damages (including, without limitation, lost profits).

(4) Landlord and Tenant each agree to perform all of their respective obligations hereunder in good faith.

Thus, under the bargained-for terms of the Lease, (a) Glenpointe's consent to a proposed sublease is required, (b) Glenpointe's consent may not be unreasonably withheld, (c) if Glenpointe withholds consent unreasonably, Buck's only remedy is that consent would be deemed given, unless (d) Glenpointe acts in "bad faith or maliciously," in which case

4

Glenpointe is subject to monetary damages for withholding consent.

In December 1996, Eisai entered into a lease with Glenpointe for approximately 50,000 square feet in Glenpointe West with a February 28, 2007 expiration date (the "Eisai Lease"). Eisai obtained additional space in Glenpointe West through a series of sublets from other Glenpointe West tenants, each time with the consent of Glenpointe, and each time extending the subleases beyond the lease termination dates of the sublandlord to be coterminous with the expiration of the Eisai Lease. By 2002, Eisai approximately doubled its occupancy in Glenpointe West, and continued to seek further expansion.

On May 30, 2002, Eisai approached Glenpointe with a request for a proposal to lease approximately 160,000 square feet in a different building owned by Glenpointe, not far from Glenpointe West.[2] However, Glenpointe responded to the request with terms that Eisai found unacceptable, and after rejecting the proposal, Eisai began negotiations with Buck to sublease approximately 50,000 square feet of Buck's space (the "subject space").

Having learned of the negotiations between Buck and Eisai,[3] Glenpointe was not to be defeated; it continued its attempts to solicit a direct lease with Eisai. Citing

_____

[2]Under this proposal, Eisai would have moved all of its operations from Glenpointe West to the new building, and would have occupied nearly the entire new building.

[3]The Record reflects that the first exchange of written proposals between Buck and Eisai took place on September 3, 2002. Several rounds of counter-proposals were exchanged until the terms of the transaction became final in October 2002.

concerns about what had become Eisai's patchwork quilt of short term leases, all of which were to expire in February 2007, on September 25, 2002, Glenpointe made a second proposal to Eisai. Glenpointe based the terms of this proposal on those Eisai had included in its initial request to Glenpointe for a proposal, offering Eisai a total of approximately 150,000 square feet of new space. Glenpointe would directly lease 99,000 square feet of this space to Eisai, and would preapprove Eisai's sublease with Buck. The proposal would extend the Eisai Lease for a term 15 years beyond the current expiration date. Glenpointe also warned Eisai that in the absence of a "long term 'game plan'" of expansion, Glenpointe was unwilling to consent to a situation where nearly half of the building would vacate "in one fell swoop" in the near term.

Despite the new offer, on October 16, 2002, Buck and Eisai agreed on the terms of the sublease. Buck was to sublease 51,922 square feet of space to Eisai, for a term to commence December 1, 2002 and terminate on February 28, 2007, the same date of the expiration of the Eisai Lease and of all of Eisai's subleases in Glenpointe West. On November 11, 2002, Buck gave Glenpointe Notice of the Intention of Buck and Eisai to enter into the sublease, requesting Glenpointe's consent to the transaction.[4] In response to the Notice, on December 10, 2002, Glenpointe sent Eisai another revised proposal with a

---

[4]As required by the Lease, on December 4, 2002, Buck's brokers faxed Glenpointe a copy of the signed Letter of Intent between Buck and Eisai, as well as Eisai's current financial statements. At this time, neither Buck nor Eisai was in default of its respective lease obligations.

6

reduced term extension to six years beyond the expiration of the Eisai Lease, yet Eisai remained uninterested.

On December 30, 2002, Glenpointe provided Buck written notice of its refusal to consent to the Buck/Eisai sublease. Glenpointe explained to Buck that unfortunately it could not provide consent to the transaction because the Eisai Lease contained a provision "prohibiting it from subleasing or otherwise occupying any space in [Glenpointe West] other than its premises." However, in fact the Eisai Lease did not contain such a provision.[5]

Shortly after communicating its refusal to Buck, on January 7, 2003, Glenpointe sent a letter to Eisai making a third proposal for a long-term lease and providing a different reason than that proffered to Buck for rejecting the proposed sublease. Glenpointe explained to Eisai that it "felt it necessary" to refuse consent "because too much space in the building might be vacated in too soon a period of time." Noting that Glenpointe could not at that time meet Eisai's immediate space requirements in Glenpointe West, Glenpointe offered Eisai 190,000 square feet in another nearby building that at the time was not yet ready for occupancy.

On January 15, 2003, Buck, dissatisfied with Glenpointe's rejection of the proposed sublease and anxious to retain the deal it had worked hard to obtain, demanded

---

[5]Jerry Barta, Vice President & Director of Leasing and Marketing at Glenpointe testified that the Eisai Lease did not contain a general prohibition against execution of a sublease for additional space in the building. (a 312-313.)

7

that Glenpointe reverse its position.[6]  Nevertheless, on January 20, 2003, Glenpointe's counsel sent a letter to Buck reiterating the reasons for its rejection, namely, the "prohibition against subletting space" in the Eisai Lease, and asserting Glenpointe's right to refuse to consent to the Buck/Eisai sublease because "the landlord in this instance has every right to be concerned about its economic self-interest and well-being in the context of the proposed subletting."  The letter also set forth a more detailed explanation of the business concerns, formerly expressed to Eisai alone, that supported Glenpointe's decision.

Specifically, Glenpointe explained that its first concern had to do with the expiration date of the sublease.  Glenpointe informed Buck that its typical practice was to stagger the expiration of lease terms in order to avoid large vacancies.  If Glenpointe were to consent to the Buck/Eisai sublease, Eisai could vacate its 106,000 square foot premises, as well as its sublet from Buck, at the same time.  With nearly half of Glenpointe West potentially becoming vacant at the same time, Glenpointe explained that it had learned from past dealings that it would face a "dangerous circumstance" in finding both new

---

[6]In the letter to Glenpointe Buck warned Glenpointe that it believed Glenpointe's refusal to be illegitimate:

> Your insistence, as set forth in the December 30 letter, that you used 'good faith' efforts to 'negotiate around' the prohibition on subleasing in Eisai's existing lease seems disingenuous given that such a provision (to the extent it actually exists) is purely for your protection.  Accordingly, you could readily waive it without any 'negotiations.'

8

tenants and new lenders.

Second, Glenpointe explained that the timing of the proposed sublease would pit Buck and Glenpointe against each other as direct competitors, as of February 28, 2007, to find tenants to occupy the 106,000 square foot vacancy created by Eisai, and the 51,922 square foot vacancy created by the expiration of the Buck/Eisai sublease. Not only did Glenpointe generally prefer not to compete with its tenants to lease space, it felt that the competition would be unfair. Glenpointe would compete at a severe disadvantage to Buck since the Lease was a "sunk cost," and Buck could potentially sublease the 51,922 square feet at a firesale price to recapture whatever portion of its obligation was possible.

Failing to obtain Glenpointe's consent, Buck and Eisai's deal fell apart. Eisai obtained space elsewhere, and Buck's space remained vacant. On January 31, 2003, Buck commenced this action in the District of New Jersey, asserting claims for breach of contract, breach of duty of good faith and fair dealing, and tortious interference with contract. Buck also sought a declaratory judgment that (1) Glenpointe's refusal to consent to the proposed sublease was unreasonable; (2) Glenpointe's unreasonable refusal constituted a material breach of the Lease; and (3) Buck was justified in withholding any and all rent due on the subject space it proposed to sublease to Eisai from February 1, 2003.

On February 1, 2003, Buck ceased paying rent to Glenpointe on the space it would have subleased to Eisai, and on February 5, 2003, Glenpointe notified Buck that it was in

9

default of its lease obligations and demanded immediate payment of the balance of base rent and additional rent. Thereafter, Glenpointe filed a counterclaim in the litigation for withheld rent, a delinquency service charge, and all reasonable expenses incurred by Glenpointe in the action. Glenpointe also asserted a Third Party Complaint against Mellon Financial as guarantor of Buck's obligations.

Glenpointe and Buck filed cross motions for summary judgment. The District Court granted Buck's motion for summary judgment as to breach of contract and breach of duty of good faith and fair dealing, and dismissed Glenpointe's counterclaim and the Third Party Complaint. The District Court granted summary judgment in favor of Glenpointe on Buck's claim for tortious interference, and, hence, found both parties to be prevailing parties entitled to attorneys' fees.

Both Glenpointe and Buck moved for reconsideration. Buck asked for reconsideration of the award of attorneys' fees to Glenpointe as a prevailing party on Buck's tortious interference claim and of the decision to grant summary judgment on that claim. Glenpointe sought reconsideration of three issues: (1) whether the court erred in finding at the summary judgment phase that Glenpointe had acted in bad faith; (2) whether the court erred in finding that Buck was entitled to withhold the rent it was required to pay under the Lease, compared to the lower rent it would have received under the proposed sublease; and (3) whether Buck or Glenpointe was required by the court's order to mitigate damages (by seeking a new subtenant).

10

The District Court granted Buck's motion for reconsideration and held that only it was entitled to an award of attorneys' fees under the Lease as a prevailing party. The District Court rejected Glenpointe's request to rethink its determination that Glenpointe acted in bad faith, and refused to consider the contours and adjustments of mitigation, reasoning that Glenpointe may not use a motion for reconsideration as an opportunity to raise new issues.

On April 29, 2005, Buck filed its final motion before the District Court for replevin of certain office furniture that remained in the subject space. On October 17, 2005, the District Court denied the motion, but ordered Glenpointe to comply with Paragraph 29 of the Lease, and make a proper request that Buck retrieve its furniture from the abandoned subject space (i.e., Glenpointe was precluded from disposing of Buck's furniture). Although Buck continued to occupy and pay rent on the portion of its leasehold other than the premises at issue, the District Court further opined that "it was uncontested" that the Lease had terminated as of the issuance of the Opinion and Order granting Buck's summary judgment motion, as affirmed by the Court's Reconsideration Order. The District Court found that the "effective[] terminat[ion]" of the Lease was the only logical offspring of its central conclusion, that upon refusing consent to the Buck/Eisai transaction, Glenpointe had materially breached the Lease. Therefore, the District Court found that except for the purposes of the replevin action, the date of the Replevin Order would serve as the effective date of the termination of the Lease. This

11

appeal followed.

## II.    LEGAL STANDARD

We exercise *de novo* review over the District Court's grant of summary judgment on an issue of state law, Pittston Co. Ultramar Am. v. Allianz Ins. Co., 124 F.3d 508, 515-16 (3d Cir. 1997), and we apply the same legal standard as the trial court to the same record. Omnipoint Commc'ns Enters., L.P. v. Newtown Twp., 219 F.3d 240, 242 (3d Cir. 2000). Viewing the underlying facts contained in the evidentiary sources submitted to the District Court in the light most favorable to the party opposing the motion, we will affirm the grant of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Cetel v. Kirwan Fin. Group, Inc., 460 F.3d 494, 506 (3d Cir. 2006) (citing Fed. R. Civ. P. 56(c)).

## III.    DISCUSSION

### A.    Whether Glenpointe's Withholding of Consent was Unreasonable[7]

The Lease between Buck and Glenpointe provides that Buck must obtain Glenpointe's prior written consent to sublease any part of its premises (Lease ¶ 11(A)), which consent Glenpointe must not unreasonably withhold. (Lease ¶ 27(J)(1)(a).) The

_____

[7]The Lease provided the option, but did not require, that the parties may arbitrate their disputes. Therefore, judicial intervention was an appropriate course of action.

12

District Court held that Glenpointe violated this affirmative covenant by withholding for purely economic motives its consent to Buck's proposed sublease with Eisai.

In New Jersey, few cases have dealt with the application of a limitation on a landlord's ability to refuse consent to a tenant's proposed sublease or assignment. However, under New Jersey law,[8] a "reasonable consent" clause in a commercial lease "is for the protection of the landlord in its ownership and operation of the particular property – not for its general economic protection." Krieger v. Helmsley Spear, Inc., 302 A.2d 129 (N.J. 1973). Therefore, in withholding consent to a proposed sublease, if a landlord considers matters (even if legitimate) that are unrelated to the ownership and operation of the "particular property," its "decision to refuse an assignment is made without fair, solid and substantial cause or reason." Ringwood Assocs. Ltd. v. Jack's of Route 23, Inc., 379 A.2d 508, 512 (N.J. Super. Ct. Law Div. 1977) aff'd in relevant part, 398 A.2d 1315 (N.J. Super. Ct. App. Div. 1979). It is the tenant's burden to prove that a landlord's conduct is unreasonable. Id.

A comparison to the factual circumstances in both Ringwood and in Krieger leads us to conclude that the District Court correctly determined that Glenpointe's refusal to consent was unreasonable. In Ringwood, the tenant, a retail clothing purveyor, sought to assign its leasehold in a shopping complex to a company that sold and repaired

_____

[8]Inasmuch as this is a diversity case, the Court looks to the law of the state of New Jersey to resolve the controversy between the parties. Rosado v. Ford Motor Co., 337 F.3d 291, 293 (3d Cir. 2003).

13

appliances. 379 A.2d at 510. The lease contained similar provisions to the Glenpointe/Buck Lease: to assign or sublease the premises, the tenant was required to obtain the prior consent of the landlord, which consent the landlord could not unreasonably withhold. Id. As is the case here, the landlord had no qualms about the suitability of the proposed assignee to the premises, or the proposed tenant's financial security. Furthermore, the proposed tenant guaranteed performance of all tenant covenants, id. at 511, similar to Buck's guarantee to remain liable for rent and all other tenant covenants. Notwithstanding these facts, the landlord objected to the assignment, and instead informed the tenant that it would only accept a direct lease with the proposed subtenant at a higher rent. Id. at 512.

The New Jersey court held that the landlord's refusal was unreasonable. In so holding, the court set out a non-exhaustive, yet instructive list of the factors related to ownership and operation of a property, upon which a landlord may reasonably ground his refusal to consent: (a) the financial solvency of the proposed subtenant; (b) the nature and suitability of the proposed subtenant's business for the premises and the business area; (c) the proposed subtenant's willingness to guarantee the payment of rent and performance of all other tenant covenants under the lease; and (d) the necessity of altering the premises to suit the subtenant's business.[9] Id. However, the court found that Ringwood's concerns

---

[9]Here, the Lease enumerated specific situations where Glenpointe's refusal to consent was per se reasonable. For example, Glenpointe could properly withhold consent if Buck proposed a sublease to a tenant, subtenant or other occupant of Glenpointe West or an

14

related to securing higher rents are general economic concerns that do not amount to a reasonable refusal to consent to a proposed assignment or sublease. Id.

Along the same lines, in Krieger the New Jersey court held that the landlord's refusal to consent was unreasonable where the sole objection made by the landlord to a proposed sublease was that the proposed subtenant was then a tenant in another building owned by the landlord. 302 A.2d 129. The landlord argued that it withheld consent reasonably because the proposed transaction would disadvantage the landlord by creating a vacancy in the landlord's other property. Id. However, the court reasoned that the landlord's activity in vying for profit and gain was exactly the type of general economic harm that the reasonable consent covenant within a lease does not protect. Id.

Glenpointe argues that under Ringwood and Krieger, it did not refuse to consent to the sublease for improper, self-interested reasons, because its considerations clearly regarded the ownership and operation of Glenpointe West. First, Glenpointe explains that Buck's proposed sublease created a significant timing problem. Because Eisai would

_____

entity with whom Glenpointe was already negotiating, and for whom Glenpointe had comparable space to make available (Lease ¶ 11(C)(1).) Glenpointe could also reasonably withhold consent to a proposed sublease if there were more than three subtenants in the premises at any one time, or if in the "reasonable judgment" of Glenpointe, the business of the proposed subtenant was not comparable with the type of occupancy found in first-class office buildings. (Lease ¶ 11(C)(1)(ii).) As the District Court noted, both parties agreed that none of these bargained-for terms is applicable to the present dispute. As such, and as urged by the parties, the Court looks to New Jersey law to determine whether Glenpointe's actions were manifestly reasonable despite the fact that they were not specifically contemplated by the contract.

15

vacate both its current leasehold and its subleasehold with Buck simultaneously, some 158,000 square feet out of the total 330,000 square feet at Glenpointe West (roughly half) would become vacant in February 2007, almost five years before Glenpointe's mortgage on the property was to expire. To create a vacancy of this size, Glenpointe argues, is akin to forcing it to accept admission to the building of a creditworthy but unsuitable tenant because commercial buildings with large amounts of vacant space are very difficult to lease.

Second, and compounding the problem of the large vacancy, Glenpointe explains that the timing of the proposed sublease would force it into direct competition with Buck. In February 2007, when Eisai's sublease with Buck, and direct lease with Glenpointe were to expire, both Buck and Glenpointe would seek tenants to occupy the spaces. However, since Buck's overlease is a sunk cost, Buck would be able to outbid Glenpointe for proposed tenants with ease. The combination of the large vacancy and the unfair competition Glenpointe argues, would threaten its ability to meet the carrying costs and debt service of its mortgage. Moreover, Jerry Barta, Glenpointe's Vice President and Director of Leasing, certified that had Eisai agreed to a direct lease with an extended term, in combination with the sublease, these doubts about carrying costs would have been alleviated because "[r]efinancing would in all likelihood have taken place."

Glenpointe has not persuaded us that its rationale was anything but economic in nature. Much like the landlord in Ringwood, Glenpointe repeatedly attempted to extract

16

higher profits from Eisai by offering to exchange its consent to the sublease for an extended and expanded direct lease with higher rents. Although Glenpointe argues that, unlike the landlord in Krieger, its concerns were not extrinsic to Glenpointe West, Glenpointe countered the Buck/Eisai proposal with one to lease large amounts of space, for rents higher than Buck was to charge Eisai, in a new property Glenpointe was then developing.

Furthermore, Glenpointe's courtship of Eisai occurred in the midst of its written refusal of consent to Buck. In the December 30, 2002 letter to Buck, Glenpointe presented an entirely different reason for denying consent to the sublease than the reasons it had previously given to Eisai, namely that the Eisai Lease prohibited execution of the sublease with Buck. Glenpointe knew that the Eisai Lease did not contain this blanket prohibition since Eisai had repeatedly subleased space in Glenpointe West. Furthermore, Glenpointe had previously offered to consent to the Buck/Eisai sublease as long as Eisai supplemented the deal with a longer, larger and more expensive direct lease. As the District Court correctly determined from New Jersey precedent, "it is unreasonable for a landlord to withhold consent to a sublease solely to extract an economic concession or to improve its economic position." Buck Consultants, Inc. v. Glenpointe Assocs., No. 03-454, slip op. at 13 (D.N.J. Jul. 23, 2004) (quoting 1010 Potomac Assoc. v. Grocery Mfrs. of America, Inc., 485 A.2d 199, 210 (D.C. 1984).

As Glenpointe correctly argues, neither Ringwood nor Krieger "straightjackets" a

17

landlord's right to consider its broader interest in the ownership and operation of a multi-tenant building. New Jersey law does not ignore the obvious necessity of a landlord to consider the suitability of a proposed tenant for a particular leasehold in the context of its operation of the entire property. Ringwood, 379 A.2d at 512 (the landlord's interest extends to his "interest in the operation of the shopping center," as opposed to the landlord's interest in the operation of the singular leasehold (storefront)). It is necessarily true that if Glenpointe cannot operate the entire building, it certainly cannot operate the leasehold. In such a case where a tenant requests the landlord to consent to a transaction that could expose the landlord to a level of risk that threatens its ownership of the building, it may be the case that a landlord is not acting with unreasonable, arbitrary, profit-driven motives in refusing to consent to the transaction.[10]

Nevertheless, we do not see that Glenpointe asserted sufficient facts to support that its operation of the building was actually endangered by Buck's proposed transaction and, hence, that its withholding of consent was reasonable. While it may be true that Glenpointe offered an expert opinion that the proposed sublease would create a "circumstance" that "puts a landlord at a disadvantage," and that Glenpointe had "a painful history of two very large tenants vacating space and leaving them in difficult straits," nothing in our reading of the expert's testimony indicates that in the relevant

---

[10]At some point, likely in the realm of severe loss, economic concerns must meet and overlap with those concerns germane to ownership. This case does not present such a factual scenario and, as such, we refrain from reaching the merits of that set of facts.

18

market, given the structure of the mortgage and the proper statistics (e.g., cap rate, new housing sales), Glenpointe could legitimately worry that it would default on its mortgage and lose the building due to this proposed transaction.

The fact that Glenpointe was willing to re-lease up to 240,000 square feet to Eisai to vacate in 2010, but remained strongly concerned about the risk to its ownership of allowing Eisai to vacate 150,000 square feet in 2007, is inconsistent with any serious fears regarding Glenpointe's ownership of Glenpointe West.  Mr. Barta's certification that Glenpointe likely would have refinanced its mortgage in the years after 2007, could it only survive past the doomsday vacancy left by Buck and Eisai, is nothing more than his own prediction.

On the record before the Court, the facts lend themselves to the District Court's conclusion that Glenpointe withheld consent to position itself more fortuitously, i.e., the very type of general economic concern which is considered unreasonable under New Jersey law.

B.      **Whether Glenpointe Withheld Consent in Bad Faith**

Having determined that the District Court correctly deemed Glenpointe to have acted unreasonably in withholding consent to the Buck/Eisai sublease, we now turn to the question of whether Glenpointe acted in bad faith.  The District Court found that, as a matter of law, Glenpointe breached the implied covenant of good faith and fair dealing arising out of Paragraph 27(J)(2) of the Lease, and, thus, allowed Buck the self-help

19

remedy of withholding the amount of rent it would have received from Eisai had Glenpointe fulfilled its obligation to give consent.

The District Court relied on Wilson v. Amerada Hess Corp., 773 A.2d 1121, 1130 (N.J. 2001), to find that Glenpointe's actions amounted to bad faith conduct. In Wilson, a price-setting case, the New Jersey Supreme Court held that a party

> breaches the duty of good faith and fair dealing if that party exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract. . .In that setting, an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent improper motive. Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance.

773 A.2d at 1130. See also Seidenberg v. Summit Bank, 791 A.2d 1068, 1078-79 (N.J. Super. App. Div. 2002) (extending the Wilson formula for bad faith to other discretionary decisions). Using the very same analysis it employed to determine unreasonableness, the District Court found that Glenpointe acted in bad faith because "its refusal to consent was motivated by economic considerations not specifically related to ownership and operation of the particular property." In particular, because Glenpointe's proffered reasons for withholding its consent were pretext for its real rationale, namely, to withhold its "consent for the sublease hostage" to the renegotiating of the Eisai Lease, the only fair inference from the record, the District Court concluded, was that Glenpointe acted in bad faith.

Even if, as the District Court concluded, Glenpointe's conflicting responses to Buck and to Eisai in refusing to consent to the sublease demonstrated pretext for

20

unreasonable economic motives, there is nothing in the record that enabled the District Court to conclude as a matter of law that Glenpointe acted with the objective of preventing Buck from receiving its "reasonably expected fruits under the contract." We find the conclusion unavoidable that the District Court blurred to the point of nonexistence the fine line between unreasonable and bad faith actions.[11]

To find that Glenpointe acted in bad faith, as a matter of law, as set forth in Wilson, requires that Buck show that Glenpointe acted with the motivation of depriving Buck of its "reasonably expected fruits under the contract." Wilson, 773 A.2d at 1130. To act in bad faith is a matter of subjective, wrongful intent: bad faith "contemplates a state of mind affirmatively operating with a furtive design or some motive of interest or ill will," and "contains an element of intent to do wrong in some degree." Browning v. Fidelity Trust Co., 250 F. 321, 325 (3d Cir. 1918) cert. denied, 248 U.S. 564 (1918). To act unreasonably, however, only requires that Buck show that Glenpointe denied consent to the sublease with only its own general economic considerations in mind. Ringwood, 379 A.2d at 512. Buck points to nothing in the record, aside from Glenpointe's various, albeit evolving, reasons for refusing to consent to the sublease, to show that Glenpointe acted with the requisite subjective, improper motivation of depriving Buck the benefit of

_____

[11]Paragraph 27(J)(4) of the Lease contains an explicit covenant of good faith and fair dealing: "Landlord and Tenant agree to perform all of their respective obligations hereunder in good faith." However, under Wilson, a breach of the implied covenant of good faith and fair dealing, similar to actions committed in bad faith, requires the same findings of ill will and improper motive. 773 A.2d at 1130.

21

its bargain.

Questions of intent are "factual determinations that should not be made on a motion for summary judgment," Gillman v. Wateres, McPherson, McNeill, P.C., 271 F.3d 131, 140 (3d Cir. 2001 (quoting Shebar v. Sanyo Bus. Sys. Corp., 544 A.2d 377, 384 (N.J. 1988)). Accordingly, we conclude that, in addition to invoking the wrong legal standard, the District Court had an insufficient factual record upon which to base its judgment of Glenpointe's intent at this juncture.

## C. Termination of the Lease

We are faced with the potential task of unraveling a somewhat convoluted remedy to Glenpointe's material breach of the Lease, a role that we eschew except to observe the following. First, to the extent that the District Court's October 17, 2005 Order terminated the Lease in toto, that Order is reversed.[12] There is nothing in the record that indicates that either party desired to terminate the Lease in its entirety. Furthermore, there is nothing in law that requires that this Lease terminate, particularly in light of the fact that both parties continued to perform obligations under the Lease with regard to the approximately 20,000

---

[12]The District Court's Order stated:

> It is not contested that the Lease was terminated when this Court ruled on the parties' cross-motions for summary judgment by Opinion and Order dated July 23, 2004. There the Court clarified the parties' obligations and responsibilities with respect to the Buck-Glenpointe lease, ruling that Glenpointe's actions were unreasonable, and thus, resulted in a material breach of the Lease. As such, the Court effectively ruled that the Lease was terminated.

22

square feet of space not touched by the proposed sublease transaction.

Second, in view of our decision, we leave to the District Court a further evaluation of whether, and to what extent, the issue of mitigation is appropriate.

We affirm the District Court's finding with respect to the unreasonableness of Glenpointe's withholding of its consent but reverse the District Court's decision with regard to bad faith and the termination of the Lease.