**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 6, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ANTERO RESOURCES
CORPORATION,

        Plaintiff - Appellee,

v.

SOUTH JERSEY RESOURCES
GROUP, LLC, and SOUTH JERSEY
GAS COMPANY,

        Defendants - Appellants.

No. 18-1163

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:15:CV-00656-REB-MEH)**

---

William R. Peterson (John M. Deck with him on the briefs), Morgan, Lewis &
Bockius LLP, Houston, Texas, for Appellants.

Marie R. Yeates (James D. Thompson III and Phillip B. Dye, Jr., Vinson & Elkins
LLP, Houston, Texas, and Michael John Gallagher, Davis, Graham & Stubbs,
Denver, Colorado, with her on the brief), Vinson & Elkins LLP, Houston, Texas,
for Appellee.

---

Before **TYMKOVICH**, Chief Judge, **MURPHY**, and **HARTZ**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

Antero Resources Company and South Jersey Gas Company entered into a eight-year contract for Antero to deliver natural gas from the Marcellus Shale formation to gas meters located on the Columbia Pipeline in West Virginia. The parties tied gas pricing to the Columbia Appalachia Index—an index created by a private publisher and widely used in the natural gas industry. During performance of the contract, the price of natural gas linked to the Index increased. South Jersey contested the higher prices, arguing that modifications to the Index materially changed the pricing methodology, and that the Index should be replaced with one that reflected the original agreement.

Antero disagreed. South Jersey then sued Antero in New Jersey state court for failing to negotiate a replacement index, and began paying a lower price based on a different index. Antero then sued South Jersey in federal district court in Colorado, where its principal place of business is located, for breach of contract for its failure to pay the Index price. The lawsuits were consolidated in the District of Colorado and the case proceeded to trial. The jury rejected South Jersey's claims, finding South Jersey breached the contract and Antero was entitled to $60 million damages.

South Jersey argues on appeal that the district court erred in denying its motion for judgment in its favor as a matter of law, or, alternatively, that the court erred in instructing the jury. We affirm the district court. We conclude

South Jersey is not entitled to a judgment as a matter of law because a reasonable jury could find South Jersey breached its contract with Antero because the Index was not discontinued nor did it materially change. We further hold South Jersey is not entitled to a new trial based on any defects in the jury instructions.

## I. Background

The contract between Antero and South Jersey took effect in October 2011 and will end in October 2019.[1] The contract requires Antero to ship and deliver natural gas to gas meters located in West Virginia, where South Jersey purchases the gas and transports it to customers. South Jersey purchases the gas at a price determined by the Columbia Appalachia Index. But pursuant to the contract, this pricing term can be renegotiated under specific circumstances. Here, Antero delivered natural gas to the agreed-upon gas meters, but South Jersey argues the contract must be renegotiated and South Jersey is no longer bound to pay the price listed by the Columbia Appalachia Index. The three terms of the contract that are significant for purposes of this litigation are the delivery term, the pricing term, and the renegotiation term.

---

[1] Antero entered into two separate agreements to sell natural gas to two related companies, South Jersey Resources Group and South Jersey Gas Company. South Jersey Gas is a regulated public utility whereas South Jersey Resources is a marketer of Marcellus Shale gas that moves the gas from the wellhead to the end user. Because the terms in question are the same in each contract, we will refer to these entities collectively as South Jersey.

We will address each of these components of the contract in turn.

## A. The Delivery Term

The gas meters where Antero delivers the gas fall within the boundaries of The Columbia Pipeline (or TCO Pipeline), which covers parts of Kentucky, Ohio, Pennsylvania, West Virginia, New York, New Jersey, and Virginia. The Columbia Gas Transmission Corporation, which oversees the transportation of gas on The Columbia Pipeline, designated numerous pools, or natural gas storage systems, along the pipeline. These pools allow sellers to aggregate their gas with other sellers prior to sale of the gas.

In addition to physical storage pools, Columbia Gas created a so-called "virtual aggregation pool" called the Interruptible Paper Pool (IPP).[2] Under the Antero–South Jersey contract, Antero had to deliver the gas to physical meters located in Doddridge County, West Virginia, where South Jersey would take

---

[2] A virtual aggregation pool is an accounting technique to manage gas transportation on gas pipelines, allowing sellers to aggregate their gas supply and sell it to buyers. The pool is simply an administrative tool—it is used to "aggregate the receipt of gas from multiple physical points in a specific geographic area to simplify accounting." *Interstate Nat. Gas Ass'n v. Fed. Energy Regulatory Comm'n*, 285 F.3d 18, 42 (D.C. Cir. 2002). Without a pool, it is difficult for buyers to purchase gas at a physical point—a large customer would be purchasing its gas at thousands of physical points. Instead, Columbia Gas monitors the gas as it goes into the pool, and the buyer can then go to any meter within that pool and obtain the gas it needs on a particular date. In order to maintain the pool balance, the supplier has to find someone to purchase the natural gas once it is delivered to the pool. Thus, buyers and sellers enter into contracts like the ones between Antero and South Jersey.

possession. While Antero's meters are part of The Columbia Pipeline, they are outside the IPP pool, meaning the gas delivered by Antero to fulfill this particular contract is not aggregated in the IPP pool.

Because Antero sold its gas to South Jersey outside the IPP pool, Antero only had to deliver the gas to meters in West Virginia. The parties agreed to a discount from the Index price because they recognized that South Jersey would incur costs in transporting gas back into the IPP pool if it wanted to resell some of its gas[3] or incur transportation costs to deliver gas to its customers in New Jersey. Antero's meters were located relatively close to the production site, which made it advantageous for Antero to deliver the gas to the meters outside the pool and for South Jersey to transport any gas it wanted to resell to the pool. At the time the contract was executed, anyone could transport gas to the pool without cost, so South Jersey did not have to pay to transport the gas to the pool.

### B. The Pricing Term

Antero and South Jersey needed a way to establish pricing for the duration of the eight-year contract. Like other market participants, they agreed to use a gas price index published by Platts McGraw Hill Financial, an industry leader in collecting and publishing average benchmark daily and monthly prices reflecting

---

[3] South Jersey Resources was also a market player in buying and selling gas. As a result, the South Jersey entities did not deliver all of its gas to utility customers in New Jersey.

market conditions. The benchmark prices allow industry participants to enter long-term purchase agreements and are based on the average price of natural gas trades in a given market. Buyers and sellers in the given market voluntarily share price information with Platts, which then uses it to calculate the daily or monthly index price. Platts's methodologies evolve "to reflect changing market conditions through time," and Platts retains some level of editorial discretion over its Index. App. 1736. The methodology statement for Platts was divided into seven parts that explained the "entire process of producing price values for the specified market period." *Id.* For their contract, Antero and South Jersey agreed to use Platts's Columbia Appalachia Index minus the agreed upon discount.[4]

At the time the contract was drafted and signed, any gas producer could deliver gas to the IPP pool. But due to the success of hydraulic fracking, gas production from the Marcellus Shale formation increased dramatically between 2011 and 2014. Reaching its capacity, The Columbia Pipeline, which previously had accepted gas from all shippers, began limiting access to those shippers with "firm transportation rights"—rights previously negotiated for a fee to guarantee

---

[4]   Using the Index, the parties would calculate prices at the first of the month, with specified reductions off the Index's base price: "For the first of the month priced gas, Inside FERC Columbia Appalachia less 12 cents, and for daily priced gas, Gas Daily Columbia Appalachia less 14 cents." App. 1674 (quoting the contract).

access to the IPP Pool. These shippers[5] thus received a first right of access on the pipeline to move their gas. As a result, the IPP pool became an exclusive club of shippers with firm transportation rights. Because fewer shippers were able to access the pipeline, more trades occurred outside the pool. South Jersey lacked firm transportation rights for the gas purchased from Antero, so South Jersey was unable to transport gas it purchased from Antero into the pool. In contrast, Antero had purchased $15 billion worth of transportation rights and had full access to the IPP pool for its other contracts.

All of this matters because South Jersey challenges the gas trades that are included in Platts's Index. If transactions outside the IPP pool are included, they drive down the average price of the Index because gas without transportation rights to the IPP pool is generally cheaper than gas with access to the IPP pool. As we discuss below, the parties contest whether transactions outside the IPP pool (non-IPP pool transactions) should have been included by Platts in calculating Index prices. According to South Jersey, all non-IPP pool transactions should have been included in calculating the Index. If non-IPP pool transactions were included in the Index, South Jersey argues that the average Index price would go down, and it would pay a cheaper price for gas purchased from Antero.

---

[5] Antero and South Jersey are both shippers in the context of this contract. Antero ships the natural gas to the gas meters, and South Jersey ships the natural gas to the IPP pool.

Under the terms of the contract, South Jersey was required to pay the price reflected by the IPP pool Index. In the fall of 2014, South Jersey complained to Platts that non-IPP pool transactions should be included in the Index. Platts informed South Jersey that while the Index covered all Appalachian gas, only IPP-pool transactions were reported and included in the Index's pricing methodology. As reported in an internal South Jersey email, Platts took the position that the "[non-IPP] trades are outliers and should not be included." App. 1683. Because "[Platts] didn't include them [in the past] . . . they didn't want to start now." *Id.*

Based in part on these inquiries from South Jersey, in November 2014, Platts issued what it called a "clarification" of how Index prices were determined. Platts announced to the industry that non-IPP pool transactions were not included in the Index, stating that "gas restricted from using the IPP pool services will no longer be included in the assessment process." App. 1721.[6] The clarification stated:

> Please note that Platts clarifies its description for Columbia Gas, Appalachia, to "Deliveries in Columbia Gas Transmission's Interruptible Paper Pool (IPP pool) from any source on Columbia Gas. Deliveries in the IPP pool which is also known as the 'TCO Pool' can originate from any source delivered into Columbia Gas' system."

---

[6] In 2014, Platts included a non-IPP pool transaction in calculating the Index. After a strong and negative reaction from the market, it sent its clarification notices.

App. 1724.[7]  Platts also later announced a new index would be created specifically for non-IPP pool transactions because those trades reflected a different market than the IPP pool market.  As a result, the Index reflected higher IPP pool transactions and the new Columbia Gas, Appalachia (Non-IPP) Index generally reflected lower prices.

## C.  The Renegotiation Term

Having failed to convince Platts to modify the Index, South Jersey turned to Antero, arguing the Index had materially changed its methodology to South Jersey's detriment.  The contract envisioned several situations where the parties could renegotiate the price provisions.  Specifically, Section 14 of the contract provided five different "market disruption events" that could trigger the need to renegotiate a replacement price—two of which are at issue in this case, 14(c) and 14 (e):

---

[7] The original description stated:

> Deliveries into Columbia Gas Transmission in eastern Kentucky, eastern Ohio, West Virginia, Pennsylvania, northern Virginia and western New York. The Appalachian pool for deliveries into Columbia begins downstream of the Leach, Ky., interconnection with Columbia Gulf Transmission; deliveries at Leach are not included. Columbia Gas operates supply pool and market-area storage facilities within this northern Appalachia region, which also has local production. Prices include *deliveries systemwide* at pools, interconnects and on-system points.

App. 1782 (emphasis added).

*If a Market Disruption Event has occurred then the parties shall negotiate in good faith to agree on a replacement price for the Floating Price . . . . "Market Disruption Event" means, with respect to an index specified for a transaction, any of the following events:*
***

(c) *the temporary or permanent discontinuance or unavailability of the index*;
***

(e) *both parties agree that a material change in the formula for or the method of determining the Floating Price has occurred.*[8]

App. 1658. The first market disruption event, "discontinuance or unavailability," might occur, for example, if Platts did not publish a price point because it lacked enough data or discontinued the relied-on Index. The other market disruption event, "material change in the formula," allowed the parties to renegotiate the pricing methodology if they agreed a material change in the Index had occurred. If either event happened, the contract instructed the parties to renegotiate the

---

[8] Section 14 provides more fully:

If a Market Disruption Event has occurred then the parties shall negotiate in good faith to agree on a replacement price for the Floating Price . . . . "Market Disruption Event" means, with respect to an index specified for a transaction, any of the following events: (a) the failure of the index to announce or publish information necessary for determining the Floating Price; (b) the failure of trading to commence or the permanent discontinuation or material suspension of trading on the exchange or market acting as the index; (c) the temporary or permanent discontinuance or unavailability of the index; (d) the temporary or permanent closing of any exchange acting as the index; or (e) both parties agree that a material change in the formula for or the method of determining the Floating Price has occurred.

App. 1658.

-10-

pricing term in good faith.  *See infra* Section II.A.2.

South Jersey approached Antero about the difficulties South Jersey faced in light of the market changes.  Both parties knew Platts was discussing the possibility of creating the new non-IPP pool index.  South Jersey wanted to preempt this decision by renegotiating with Antero immediately, whereas Antero wanted to wait and see what Platts decided to do with the Index.  Antero ultimately determined the existing circumstances did not constitute a market disruption event, but it offered to explore other long-term options with South Jersey.  Communications broke down and, pursuant to a remedies provision of the contract,[9] South Jersey began paying what it deemed to be the correct amount.

South Jersey sued in New Jersey state court because it believed Antero breached the contract by failing to renegotiate the pricing term.  Antero then filed a lawsuit in federal court in Colorado, claiming that neither a market disruption

---

[9] Section 7.4 of the contract provides:

> If the invoiced party, in good faith, disputes the amount of any such invoice or any part thereof, such invoiced party will pay such amount as it concedes to be correct provided, however, if the invoiced party disputes the amount due, it must provide supporting documentation acceptable in industry practice to support the amount paid or disputed without undue delay. In the event the parties are unable to resolve such dispute, either party may pursue any remedy available at law or in equity to enforce its rights pursuant to this Section.

App. 1654.

event nor a material change in the Index had occurred and that South Jersey was required to pay the Index price. South Jersey counterclaimed.

The district court denied summary judgment for both parties and allowed the claims and counterclaims to proceed to a jury trial. The jury found in favor of Antero. South Jersey filed a motion for judgment as a matter of law, which the district court denied. South Jersey appeals the district court's ruling and also alleges the jury instructions were erroneous, warranting a new trial.

## II. Analysis

South Jersey contends the district court erred in denying its motion for judgment as a matter of law. South Jersey argues the court erred in failing to find as a matter of law that Antero breached the contract because a market disruption event had occurred, requiring the renegotiation of the contract's price terms. But the district court concluded that whether a market disruption event had occurred was indeed a question of fact and denied South Jersey's post-trial motion. South Jersey also argues the district court incorrectly instructed the jury on New Jersey contract law.

We review each argument in turn.

### A. Judgment as a Matter of Law

South Jersey makes two arguments for judgment in its favor as a matter of law. It contends a market disruption event under Section 14 of the contract

occurred because (1) the Index was temporarily or permanently discontinued or unavailable after Platts created a new index for non-IPP pool trades; and (2) there was a material change in the formula for or the method of determining gas prices. Because South Jersey sees no fact issues, it argues the district court should resolve the claims in its favor.

A judgment as a matter of law is permitted under Federal Rule of Civil Procedure 50 after a party has been fully heard on an issue and before the case is submitted to the jury. The party may renew the motion after the jury verdict. "We review the district court's denial of a motion for judgment as a matter of law de novo, applying the same legal standard as the district court." *Brown v. Gray*, 227 F.3d 1278, 1285 (10th Cir. 2000). We draw all inferences in favor of the non-moving party, asking whether the "evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1268 (10th Cir. 2000).

South Jersey argues the plain meaning of the contract and the changed methodology behind the Platts Index compel the conclusion that a market disruption event occurred.

### 1. *Discontinued or Unavailable*

The first question is whether the Index was unavailable or discontinued

under Section 14(c) as a matter of contract interpretation. This type of market disruption event was an easier hurdle for South Jersey to prove since it need not establish the materiality requirement found in Section 14(e).

Under New Jersey law, the terms of the contract are interpreted according to their "plain and ordinary meaning" to ascertain the objective manifestations of the parties. *M.J. Paquet, Inc. V. N.J. Dep't of Transp.*, 794 A.2d 141, 152 (N.J. 2002). But "[t]rade terms, legal terms of art, numbers, common words of accepted usage and terms of a similar nature should be interpreted in accord with their specialized or accepted usage." *Mellon Bank v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1013 (3d Cir. 1980).

South Jersey contends the change in the description of the Index as well as the creation of the new, non-IPP index rendered the Index discontinued or unavailable under a proper reading of the contract. At the time the contract was entered into Platts defined the Index as covering "deliveries systemwide at pools, interconnects and on-system points:"

> Deliveries into Columbia Gas Transmission in eastern Kentucky, eastern Ohio, West Virginia, Pennsylvania, northern Virginia and western New York. The Appalachian pool for deliveries into Columbia begins downstream of the Leach, Ky., interconnection with Columbia Gulf Transmission; deliveries at Leach are not included. Columbia Gas operates supply pool and market-area storage facilities within this northern Appalachia region, which also has local production. Prices include *deliveries systemwide* at pools, interconnects and on-system points.

App. 1782 (emphasis added). But, according to Platts, the only reported transactions on the TCO Pipeline were IPP pool transactions. As recounted above, after the IPP pool reached capacity and transactions outside the pool generated price points, South Jersey challenged Platts on this interpretation, and Platts clarified that the Index only includes "[d]eliveries in the IPP pool." App. 1724.

Soon thereafter, Platts began publishing the Columbia Gas, Appalachia (Non-IPP) index. South Jersey sees this bifurcation between IPP pool and non-IPP pool transactions as unassailable evidence that the Index to which they agreed in the contract had been discontinued and replaced by two newer indexes. Antero points out that the Index was based exclusively on IPP pool transactions because, before the transportation restraints, everyone had access to the IPP pool and everyone was making trades in the pool. Thus, the Index never changed.

We are convinced that the question of what transactions were reflected in the Index is a question of fact for the jury. South Jersey's argument is that Platts changed the Index surreptitiously by not including non-IPP pool transactions that should have been included. South Jersey asks us to find that, as a matter of law, the Index was discontinued or unavailable. It contends the failure to include non-IPP pool transactions was a material change to the Index's methodology that fundamentally "changed" the Index into something new and different.

"Unavailable" means not "capable of use for the accomplishment of a purpose." Webster's Third New International Dictionary (2002). "Discontinue" means "to break off" or to "end the operations or existence of." *Id.* These definitions require that—for the Index to become unavailable or discontinued—the original Index included or was required to include non-IPP pool transactions.

But we are unable to reach this conclusion. It is a factual rather than legal question whether Platts intended to use non-IPP pool transactions to calculate the Index or whether Antero and South Jersey had an understanding that non-IPP pool prices would be included in the Index. Based on the language of the contract it is not clear the exclusion of non-IPP transactions reached the level of discontinuance or unavailability of the Index. Discontinuance or unavailability depends on what transactions were being measured previously, the expectations of the parties, and the natural gas industry customs. As a result of these factual questions, it was appropriate for the district court to allow the jury to determine whether the Index was discontinued or unavailable and, therefore, whether Antero was required to renegotiate the contract.

The evidence viewed most favorably to Antero could support the jury's conclusion that the Index was not discontinued or unavailable. While Platts created a second index specific to non-IPP pool sales, it did so because non-IPP pool transactions created a new market. There was evidence that non-IPP pool

-16-

transactions had not been included in the Index because, with free transportation to the pool, all transactions were IPP pool transactions. Everyone had access to the IPP pool, so everyone used the IPP pool. Even if the Index theoretically could have included non-IPP pool transactions under the original description, the evidence suggested the reality that non-IPP pool transactions were outliers and therefore should be excluded. And, moreover, that practice was common knowledge in the industry. One Antero official testified that industry participants "knew the non-IPP deals aren't included in the IPP pricing index." App. 1040.

Other evidence supports this interpretation that non-IPP transactions were excluded from the Index. A Platts witness testified that when a trading location is "discontinued," it means Platts "d[oes]n't assess the point anymore." *Id.* When an index is "unavailable," it typically means Platts "did not publish a price in a given bid week for a location" because it lacked the requisite information. *Id.* Another witness testified that when Platts discontinued an index, it issued an announcement that it was removing certain pricing locations. *Id.* at 1042. Platts acknowledged that it was only "getting postings for the pool" and thus the pricing only reflected IPP pool transactions. *Id.* at 1681. The jury heard testimony that non-IPP pool sales "were not previously included in the [Index]," *Id.* at 1039, and that "Platts was not including non-IPP trades on [the Index]," *Id.* at 1364.

These statements are not dispositive, but the jury was free to believe this

testimony and conclude the contract's use of the word "discontinued" mirrored the Index's definition of the word "discontinued." *See Harsco Corp. v. Renner*, 475 F.3d 1179, 1185–86 (10th Cir. 2007) ("[The panel] will refuse to weigh the evidence, pass on the credibility of the witnesses, or substitute [its] conclusions for those of the jury."). The jury could then reasonably conclude the Index was not discontinued for purposes of the contract and South Jersey, rather than Antero, breached the contract by underpaying the Index price.

In sum, the underlying content of the Index and its operation by Platts does not compel a ruling in South Jersey's favor as a matter of law. The jury was entitled to determine whether the Index was unavailable or discontinued.

### 2. *Material Change*

Next, for mostly the same reasons, South Jersey argues the failure to include non-IPP pool transactions in the Index was a material change in the Index as a matter of law. The contract states a market disruption event occurs when "both parties agree that a material change in the formula for or the method of determining the [price] has occurred." App. 1658. As a practical matter, this argument is the mirror image of whether the Index was unavailable or discontinued: Was the Index required to include non-IPP pool transactions and did exclusion fundamentally alter the Index?

South Jersey argues that as a matter of law, the court should find that a

material change occurred. It contends (1) under an objective standard, any reasonable party would agree the condition was met, and (2) alternatively, it was excused from satisfying this condition because of Antero's bad faith conduct.

### a. Objective Standard

South Jersey contends the material change provision should be analyzed under an objective standard. That is, would a reasonable person agree a material change occurred? As an initial matter, the terms of the contract do not require us to analyze the agreement under an objective standard. *See Silvestri v. Optus Software, Inc.*, 814 A.2d 602, 609 (N.J. 2003) (holding that when a contract contains a satisfaction clause, the contract must specify that an objective standard controls or it will be evaluated under a subjective standard). South Jersey points to *Transworld Aggregate, LLC v. Western Logging Ltd.*, 2011 WL 4435090 (N.J. Sept. 26, 2011) (unpublished), but that case involved a settlement agreement where the parties agreed a subjective standard would not apply.

South Jersey also relies on Section 228 of the Restatement (Second) of Contracts, which states that when an obligee's performance is conditioned on an obligor's satisfaction, "an interpretation is preferred under which the condition occurs if such a reasonable person in the position of the obligor would be satisfied." Restatement (Second) of Contracts § 228 (1981). But here, there is no obligor or obligee with respect to the pricing term in the contract. Platts, a third

party, determined the pricing index, and the Platts calculation did not depend on performance by Antero or South Jersey.  The contract only specified that both parties had to agree a material change had occurred.  Perhaps the Restatement could be read to encompass this situation; but in any event, New Jersey law controls.

Finally, South Jersey points to *Dynamics Corporation of America v. United States*, 17 Ct. Cl. 60 (Ct. Cl. 1989), a case where the parties used a third-party pricing index.  There, the price adjustment clause was tied to an index published by the Bureau of Labor Statistics, which provided that—in the event the method to calculate the index was changed—appropriate adjustments would be made by the parties.  *Id.* at 61–62.  Notably, the price adjustment clause specified that "[i]n the event the BLS alters its method of calculating the index, appropriate adjustments shall be made by the parties." *Id.* at 61. There was no requirement to agree the index had changed.  Rather, the change to the index triggered the duty of the parties to make appropriate adjustments.  Here, in comparison, the contract specifies the parties must agree that the method of calculating the Index changed.[10]

---

[10]  It is also worth noting that *Dynamics* was decided by the Court of Federal Claims on a motion for partial summary judgment.  The court concluded there was a change in the method of calculating the index, so the parties were required to make adjustments.  17 Cl. Ct. at 65.  Here, however, the district court
(continued...)

Even if we agreed an objective standard applies, it is unlikely South Jersey could demonstrate a material change occurred. As we discussed above, fact questions existed as to the composition of the Index. But based on all the evidence presented at trial, a reasonable juror could conclude Platts never included the non-IPP pool transactions, and therefore no material change occurred. Based on this evidence, we would be unable to conclude that, as a matter of law, a material change occurred. And it is likely that a jury would have found no material change occurred. Thus, South Jersey would not likely prevail regardless of whether we apply an objective standard.

### b. Bad Faith

South Jersey's second argument is that Antero acted in bad faith by failing to agree a material change had occurred, thus excusing South Jersey from using the Index.[11] There are several reasons why South Jersey's argument fails.

---

[10](...continued)
determined there was enough evidence to proceed to the jury on the question of whether the exclusion of certain data (non-IPP pool sales) caused a discontinuance or unavailability of the index. Neither the jury nor the district court needed to determine whether a material change occurred because the contract explicitly conditioned that determination on the agreement of the parties.

[11] This argument depends on the acceptance of South Jersey's premise that an objective standard governs the agreement requirement in the contract. South Jersey argues the agreement is a condition subsequent, and Antero's bad faith prevented the condition that the parties agree to the material change from occurring. Therefore, South Jersey argues, the court should treat Antero as having agreed because, under the objective standard, a reasonable person would

(continued...)

First, a reasonable person, specifically Antero, could find that no material change occurred so South Jersey is not excused from performance. The jury found South Jersey breached the contract and Antero did not.[12] To reach this conclusion, the jury had to find that no market disruption event occurred. While we cannot dissect this factual finding, we do know that the only way to reach this conclusion was for the jury to find either (1) there was no discontinuance or unavailability of the index, or (2) the parties did not agree that a material change had occurred.

As discussed previously, evidence presented at trial showed the Index was not discontinued or unavailable. Similarly, evidence showed there was no material change to the Index. The jury heard testimony that non-IPP pool transactions had previously been considered outliers and were never included in the Index. The district court instructed the jury that "to prove a Market Disruption Event under SECTION 14(e) of the Contracts, [South Jersey] ha[s] the burden to prove by a preponderance of the evidence that plaintiff Antero breached its implied duty of good faith and fair dealing by acting in bad faith." App. 575.

_____

[11](...continued)
have agreed.

[12] The parties conceded that they did not agree. We only need to reach the question of whether a material change occurred if we apply South Jersey's proposed objective standard. We are not applying this proposed objective standard.

-22-

Based on the evidence presented at trial and the jury instructions, a reasonable jury could find that no material change occurred. If the jury found that no material change occurred, then the jury would have to conclude South Jersey was not excused from performance.

South Jersey's second argument to excuse its performance is that Antero did not act in good faith. It points to *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121 (N.J. 2001), arguing that the correct Uniform Commercial Code standard for good faith includes both subjective and objective standards. *Wilson* says good faith is "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." *Id.* at 1126 (quoting N.J. Stat. § 12A:2-103(1)(b)). "The observance of reasonable commercial standards of fair dealing is the objective element." *Id.* "Honesty in fact" is a subjective element. *Id.* But an economically advantageous contract is not necessarily a dishonest one nor does it necessarily violate commercial standards. To meet the good faith standard espoused in *Wilson*, South Jersey must point to something more than just Antero's "windfall" gains under the contract. Aplt Br. 39.

We see two problems with this argument. First, in the district court, South Jersey failed to provide evidence of a reasonable commercial standard.[13] No

---

[13] During the jury charge conference, the district court expressed doubt that South Jersey had presented any evidence of a reasonable commercial standard. South Jersey does not dispute this on appeal but states, conclusively, that "the
(continued...)

witness explained what the industry standards were or what conduct would violate them. Nor on appeal has South Jersey set forth the reasonable commercial standard of fair dealing, let alone shown how Antero failed to meet this standard as a matter of law. Without South Jersey showing that Antero was dishonest or failed to act according to the commercial standard of fair dealing, we cannot overturn the jury's conclusions to the contrary. Accordingly, South Jersey has failed to show it was excused from performance based on Antero acting in bad faith.

Finally, even though South Jersey argues Antero breached the contract first by failing to renegotiate—excusing South Jersey's performance—South Jersey did not follow the terms in the contract for renegotiating the price after a material change or disputing the amount invoiced. Two important parts of the contract are relevant. First, the contract specified the process for renegotiating a replacement price—if the parties failed to agree on a replacement price, then each party would submit two quotes, and the resulting price would be the average of the four quotes. If one party failed to submit two quotes, then the parties would average the two quotes provided by the complying party. Second, the contract also specified that if the invoiced party (South Jersey) disputed the amount due, it

_____

[13](...continued)
uncontroverted evidence established that Antero failed to follow 'reasonable commercial standards of fair dealing.'" Aplt. Br. 38.

could pay an amount it believed to be correct as long as it provided supporting documentation.

We recognize the renegotiation process is only triggered after the parties agree a material change has occurred. Even so, South Jersey did not even attempt to comply with the two-quotes requirement or the invoice-dispute procedures, nor did South Jersey provide supporting documentation for its lower payments. Instead, when Antero refused to agree a material change had occurred, South Jersey responded by paying a price outside the new non-IPP pool index altogether. While the jury could have found this was sufficient performance, it was also free to find South Jersey breached the contract first and was not excused from performance.

\* \* \*

In conclusion, we are persuaded the district court properly concluded that the jury needed to resolve fact questions as to whether the contract was breached and whether any circumstances excused performance.

### B.  Jury Instructions

South Jersey next argues it is entitled to a new trial based on erroneous jury instructions. South Jersey points to three perceived problems in the jury instructions: (1) the jury was not instructed to use an objective standard to review the material change requirement; (2) the jury was not properly instructed on bad

faith; and (3) the jury was given inconsistent instructions about the burden of proof for showing bad faith.

We review the district court's "decision about whether to give a particular instruction for abuse of discretion." *Martinez v. Caterpillar, Inc.* 572 F.3d 1129, 1132 (10th Cir. 2009). If a party fails to object to a particular instruction at trial, we review for plain error. *United States v. Willis*, 476 F.3d 1121, 1127 (10th Cir. 2007). Under plain error review, "we will affirm unless the instructions were patently, plainly erroneous and prejudicial." *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1094 (10th Cir. 2007). But the court "review[s] de novo whether a district court's jury instructions correctly stated the governing law." *Pratt v. Petelin*, 733 F.3d 1006, 1009 (10th Cir. 2013).

### 1. *Objective Standard*

South Jersey's first argument is that the district court should have instructed the jury to use an objective standard to determine whether a material change in the index occurred. Applying this standard, the jury would have been required to consider whether a reasonable person would agree the Index materially changed. Otherwise, the argument goes, the contractual term would be "surplusage" since no party would ever agree there had been a material change if the change favored its position. The district court rejected this argument,

although it did include portions of the instruction requested by South Jersey.[14]

As noted previously, the contract outlined several market disruption

contingencies that would be grounds for renegotiating the price methodology.  We

---

[14]  South Jersey asked that the jury be instructed the contract contained an implied covenant of good faith and fair dealing.  The district court agreed.  The court provided this instruction:

> *The law provides that every contract includes an implied covenant of good faith and fair dealing.* Defendants SJRG and SJG allege that, in refusing to agree that there has been a material change in the formula for or method of determining the natural gas pricing index as defined by SECTION 14(e) of the Contracts, plaintiff Antero *breached its implied duty of good faith and fair dealing by acting in bad faith*.
> To find that a party acted in bad faith, you must decide whether that party acted with bad faith to interfere with the other party's rights to receive the benefits of a contract. Proof of bad motive or intent is essential to a claim that a party has acted in bad faith.
> In considering what constitutes bad faith, you should consider a number of factors, including the expectations of the parties and the purposes for which the contract was made. You should consider also the level of sophistication between the parties, whether the parties had equal or unequal bargaining power, and whether a party's action involved the exercise of discretion. Keep in mind, however, that bad faith is not established by simply showing that a party's motive for its actions did not consider the best interests of the other party. Contract law does not require parties to behave thoughtfully, charitably, or unselfishly toward each other. For a bad-faith claim to prevail, you must specifically find that bad faith motivated a party's actions. A party who acts in good faith on an honest, but even mistaken, belief that its actions were justified has not acted in bad faith.
> In attempting to prove a Market Disruption Event under SECTION 14(e) of the Contracts, defendants SJRG and SJG have the burden to prove by a preponderance of the evidence that plaintiff Antero breached its implied duty of good faith and fair dealing by acting in bad faith.

App. 575 (emphasis added).

have already determined an objective standard did not apply to the agreement requirement in the contract under New Jersey law. *See supra* Section II.A. But even if the objective standard did apply, it is unlikely that South Jersey would prevail.

The jury found no market disruption event occurred—the Index was not discontinued or unavailable. In so concluding, the jury could have found, and likely did find, that non-IPP pool transactions were never included in the Index price. And this finding would be supported by evidence presented at trial. *See supra* Section II.A.2. Accordingly, the jury would necessarily have found the methodology or calculation of the Index did not change—that is, there was no material change to the Index. Although the jury could have based its finding that the Index was not discontinued or unavailable on other evidence, the overwhelming evidence at trial suggests the jury found that non-IPP pool transactions were never previously included in the Index. While it is not the role of the appellate court to debate the basis for the jury's findings, the record below supports the conclusion that it is unlikely that South Jersey would prevail even if the objective standard was applied.

### 2. *Bad Faith*

South Jersey's second argument is that the jury was not properly instructed on bad faith under New Jersey law. In particular, and similar to its arguments

above, South Jersey argues the jury was not instructed to take into account commercial standards of reasonableness—an objective standard—when determining whether Antero acted in bad faith. We noted previously that South Jersey failed to present any evidence regarding commercial standards of reasonableness, so the district court properly refused to instruct on that.

We agree the instruction does not explicitly tell the jury to consider commercial standards of reasonableness or to use an objective standard. But it instructs jurors to consider a variety of objective factors, like party sophistication and party expectations, which indicate some indicia of objectivity. We do not require the district court to use any magic words, and we find the bad faith instruction properly told the jury it could consider a variety of objective factors.[15]

### 3. Burden of Proof

Finally, South Jersey argues the district court erred by giving conflicting

---

[15] We held above that an objective standard does not apply to the agreement requirement in Section 14(e) because of the plain language of the contract. *See supra* Sections II.A.2.A; II.B.1. Thus, we do not ask whether a reasonable person would agree a material change occurred—we only ask whether the parties in fact agreed. Separately, we recognized the New Jersey standard for acting in good faith in contract dealings does have an objective component. *See Wilson*, 773 A.2d at 1126. But these are separate questions. One focuses on contract interpretation while the other focuses broadly on the parties' good faith in all aspects of the contract.

In examining the jury instructions, we focus on the latter question—the New Jersey standard for good faith, which does include an objective component. This is not the same question of whether the district court should have instructed the jury on an objective standard. Instead, this is a broader question about what it means to act in good faith in performing the contract.

instructions about the burden of proof. Specifically, it argues the court's inadequate instructions confused the jury about who had the burden of proof to show bad faith.

In Instruction 16, the district court told the jury that South Jersey had the burden to prove Antero breached its implied duty of good faith, which exists in every contract as a matter of New Jersey law. But in Instruction 12, the jury was instructed to consider whether Antero proved it "did what the contract required [it] to do"—including act in good faith. App. 569–70. South Jersey argues these conflicting instructions warrant a new trial.

South Jersey argues the district court could have avoided this error by including an instruction that if Antero's refusal to agree that a material change occurred constituted bad faith, then the district court, as a matter of law, would have to find that a market disruption event occurred. That is, but for Antero's bad faith, the parties would have agreed the Index materially changed and would have renegotiated a new price. This would mean Antero could not successfully show South Jersey breached the contract and South Jersey would succeed on its counterclaims.

But South Jersey did not preserve this argument below and we must review for plain error. During trial, South Jersey objected to the combination of Instructions 12, 13, and 16, arguing that, as written, the combined instructions did

-30-

not explain to the jury that they could consider the breach of duty of good faith in determining Antero's breach of contract claim. It then proposed a solution, asking the court to adopt the following instruction: "The law provides that every contract contains an implied covenant of good faith and fair dealing." App. 1535.

After the court agreed to amend the instructions accordingly, South Jersey moved on to objecting to other instructions. At no point did South Jersey renew its objection to Instruction 12, 13, and 16.

Objections are required to be "obvious, plain, or unmistakable." *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1514 (10th Cir. 1984); *see also Palmer v. Hoffman*, 318 U.S. 109, 119 (1943) ("In fairness to the trial court and to the parties, objections to a charge must be sufficiently specific to bring into focus the precise nature of the alleged error."); *Cmty. Nat. Life Ins. Co. v. Parker Square Sav. & Loan Ass'n*, 406 F.2d 603, 606 (10th Cir. 1969) (holding the objection to the instruction was "not sufficient because it was not distinct in explaining the grounds for objection as required by Rule 51"). Based on South Jersey's objection made during the jury instruction conference, South Jersey's own proposed solution, and the amended instruction, it is not at all obvious that South Jersey still objected to the combination of Instructions 12, 13, and 16.

Because South Jersey failed to put "the district court on notice," we review for plain error. *Reed v. Landstar Ligon, Inc.*, 314 F.3d 447, 453 (10th Cir. 2002). We conclude the district court's failure to instruct the jury about the relationship between the finding of bad faith and the finding of a market disruption event was not plainly erroneous.

South Jersey's argument about Antero acting in bad faith is related to South Jersey's own breach-of-contract counterclaim rather than Antero's breach-of-contract claim. The jury was instructed in Instruction 14 that South Jersey must show Antero breached the contract. Following the logic of South Jersey's argument, this instruction would be inconsistent with Instruction 12 that Antero carries the burden of showing it did not breach the contract. This is the result of two competing breach-of-contract claims. The jury was free to examine the evidence and find that both parties breached the contract, neither party breached the contract, or only one party breached the contract. Thus, there was no need to instruct the jury that finding Antero acted in bad faith required a finding of a market disruption event and therefore a finding of no breach of contract by South Jersey.[16]

_____

[16] Instructions 12 and 13 stated Antero had the burden of proof for claims brought against South Jersey Gas Company and South Jersey Resources Group. Instructions 14 and 15 stated South Jersey Gas Company and South Jersey Resources had the burden of proof for the counterclaims brought against Antero. These are not competing instructions but rather a result of the parties bringing

(continued...)

\*   \*   \*

In sum, the district court did not commit reversible error in its instructions to the jury.

## III.  Conclusion

This case presents close and difficult legal questions within a complex factual framework.  Ultimately, we are persuaded the district court did not err in submitting the questions of fact to the jury, and did not err in instructing the jury. We therefore affirm the judgment of the district court.

---

(...continued)
breach of contract claims against the other.