NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0829-19

WILMINGTON SAVINGS
FUND SOCIETY, FSB, d/b/a
CHRISTIANA TRUST, not
individually but as trustee for
PRETIUM MORTGAGE
ACQUISITION TRUST,

      Plaintiff-Respondent,

v.

PATRICIA E. DAW and
RICHARD C. DAW,

      Defendants-Appellants,

and

TD BANK, N.A., and STATE
OF NEW JERSEY,

      Defendants.

_____

<div style="border:1px solid black; display:inline-block; padding:8px;">

**APPROVED FOR PUBLICATION**

October 22, 2021

**APPELLATE DIVISION**

</div>

Argued October 4, 2021 – Decided October 22, 2021

Before Judges Sabatino, Rothstadt, and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Ocean County, Docket No. F-007259-16.

Joseph Albanese argued the cause for appellants.

Gene R. Mariano argued the cause for respondent (Parker McCay, PA, attorneys; Gene R. Mariano, on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

When a mortgaged residence is damaged by a storm and the homeowners' property or flood insurer pays benefits for the storm damages, how should the mortgage company determine whether to use those insurance funds to pay down the delinquent mortgage principal and interest, or, alternatively, use the funds to repair the property, as provided by the loan agreement?

More specifically, if the loan agreement states the lender may choose to apply the funds to the outstanding debt if either repairs are "economically infeasible" or if such expenditures would impair the lender's security interest, does the lender have an obligation to the borrower to make that decision promptly and in good faith?

In the present case, the lender's assignee held the storm insurance proceeds for over three years before ultimately applying them to the homeowners' outstanding debt. During that lengthy interval, an estimated sum of $40,000 in mortgage interest accrued. Negotiations to modify the terms of the loan failed when the assignee demanded that two thirds of the insurance funds be applied

2

to the debt upfront as a condition of the loan modification, which the homeowners contend would have left them with insufficient funds to complete all the repairs and disqualify them for a state grant that they had conditionally received.

Relying on two unpublished federal district court cases and other authorities, the homeowners contend the assignee acted unfairly by purposely stalling the process to drive up the interest owed on the mortgage, while allegedly never intending to apply the insurance funds to repairs. Therefore, they contend the insurance funds should have been applied to the mortgage principal and interest earlier, and the amount of the final judgment of foreclosure should be reduced accordingly. The assignee counters that it acted in good faith and made generous efforts to propose a loan modification that was requested by the delinquent borrowers in an effort to enable them to keep their home. The assignee contends the mortgage interest during the three-year interval was appropriately charged until a final decision was made about the use of the insurance proceeds.

Consistent with principles of fairness and reasonableness expressed in the Restatement (Third) of Property (Mortgages) (1997), we hold the mortgage lender (or its assignee) in such situations owes the borrower an implied covenant

of good faith and fair dealing in determining the disposition of the property or insurance funds.

Once the lender is provided with adequate information to determine how the insurance funds should be used—such as the estimated costs of repairs and market values—the lender is obligated to clearly advise the borrower within a reasonable period of time as to whether the requested use of insurance monies for repairs is economically infeasible or will impair its security in the property. The time to notify the borrower of the disposition may be extended if the parties mutually undertake good-faith negotiations to modify the loan terms. If the lender unreasonably delays making a decision to approve the proposed use of the insurance funds for repairs, the court has the equitable power to abate the mortgage interest that has accumulated in the meantime. Additionally, the lender must place the insurance funds in an interest-bearing, segregated account until the proper use of those funds is resolved.

Having announced these governing principles, we remand this matter to the trial court to develop the record more fully and evaluate whether the lender's assignee breached the implied covenant and, if so, to fashion an appropriate remedy such as a reduction of the amount of the final judgment of foreclosure.

A-0829-19

Lastly, we affirm the trial court's rejection of the borrowers' separate claim that they have a right to be reimbursed by the lender for costs they incurred in making immediate repairs to the residence after the storm.

I.

At the relevant times, defendants[1] Patricia E. Daw and Richard C. Daw owned a house on Laurel Drive in Point Pleasant. They occupied the house as their primary residence.

In February 2007 the Daws obtained a $350,000 mortgage loan from Commerce Bank, with a term of thirty years and a yearly interest rate of 6.125%. Through a series of assignments, the note and mortgage were eventually assigned to plaintiff[2] Wilmington Savings Fund Society, FSB, d/b/a Christiana Trust, Not Individually but as Trustee for Pretium Mortgage Acquisition Trust.

Superstorm Sandy and Its Aftermath

On October 29, 2012, Superstorm Sandy battered the Jersey Shore. As described by the Daws, the storm caused the ocean to break through the dunes

---

[1] The two other defendants named in the foreclosure complaint have not participated in the litigation.

[2] For ease of discussion, we generally will use the term "plaintiff" to refer to not only the named plaintiff, the mortgage assignee, but also its loan servicer, Rushmore Loan Management Services ("Rushmore"), unless a specific reference to Rushmore is warranted.

A-0829-19

near their Point Pleasant home and rush into the bay. The residence was flooded with over two feet of water, destroying much of the first floor and requiring it to be gutted.

Using their savings, the Daws quickly made a host of emergency repairs to the house in the wake of the storm. Among other things, they replaced flooring, doors, drywall, the boiler and water heater, several appliances, and various other items. Those immediate repairs cost the Daws more than $42,000.

After the storm, in mid-November 2012, the parties entered into a loan modification agreement, which reduced the annual mortgage interest rate to 4.625% and extended the maturity date from March 1, 2037 to November 1, 2052. At the time of the 2012 modification, the principal balance was $368,016.21.

In the months following the storm, the Daws' income declined and they became unable to make their monthly mortgage payments. Mr. Daw was collecting Social Security and temporary disability due to an injury that limited his ability to work as a carpenter. As the housing market crashed, Mrs. Daw stopped working as a realtor and she obtained part-time work as an office manager. She became eligible for Social Security in March 2015.

By February 2014, the Daws defaulted on the mortgage.

A-0829-19

The $150,000 RREM Grant

Meanwhile, the Daws attempted to muster the funds to complete the restoration of their house. They applied for a grant from the New Jersey Department of Community Affairs ("DCA") through its Reconstruction, Rehabilitation, Elevation and Mitigation ("RREM") program.[3]

In September 2014 the Daws were awarded a RREM grant in the amount of $150,000. The grant was conditional on the Daws elevating the house one foot above base flood elevation and residing in the premises long-term. Further, if the mortgage lender foreclosed on the premises, the State had the right to terminate the RREM grant and seek recoupment of the grant funds already paid to the homeowners.

By signing the RREM Agreement, the Daws also "agree[d] to the scope of work (Total Development Cost . . .) as prepared by a RREM program manager." The Total Development Cost for their home was calculated by the

---

[3] RREM was established after Superstorm Sandy to help New Jersey individuals and communities make repairs to their homes and small businesses. See Exec. Order No. 128 (Mar. 15, 2013), 45 N.J.R. 781(a) (Apr. 15, 2013). The United States Department of Housing and Urban Development, through the Community Development Block Grant program, provided funds to DCA, which allocated those funds to programs including RREM. See Dep't of Cmty. Affs., No. 2.10.36, Reconstruction, Rehabilitation, Elevation, and Mitigation (RREM) Program Policies and Procedures.

A-0829-19

agency to be $292,287.09.[4] In accepting the RREM money, the Daws promised to complete all the repairs detailed in the "Total Development Cost."

The $150,000 Flood Insurance Proceeds

Concurrently, the Daws filed a storm damage claim with their flood insurance company. The flood insurer approved the claim and in mid-May 2015 issued two checks totaling $149,847.71.[5] Pursuant to the terms of the mortgage and the insurance policy, the funds were paid to the mortgage company's servicer, Rushmore.

In a letter dated September 25, 2015, Rushmore notified the Daws it had received the insurance proceeds. Rushmore requested the Daws provide information, including copies of the insurance adjuster's report, a contractor's bid or estimate, and the contractor's license. Upon receipt of these documents, they placed the funds in a restricted escrow account controlled by Rushmore.[6] Although the appellate record appears incomplete as to what exactly was

---

[4] We will round up this figure to $300,000 for ease of discussion.

[5] We likewise round up this figure to $150,000 for ease of discussion.

[6] Plaintiff's counsel represented to us during oral argument that this escrow account apparently was not interest-bearing, although the Daws' counsel believed that it was.

A-0829-19

supplied, the Daws provided various documents to Rushmore, including documentation of the RREM grant.

<u>The Mortgage Provisions Concerning Insurance Proceeds</u>

The disposition of the insurance proceeds was governed by several provisions within the mortgage. These provisions apparently are common or standard terms that have been discussed in other mortgage cases.

The key provision, Section 5, titled "Property Insurance," focuses upon whether repairs are "economically feasible" and whether using the insurance proceeds for repairs would "lessen the lender's security" in the premises. Section 5 reads in pertinent part as follows:

> In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender . . . <u>any insurance proceeds</u>, whether or not the underlying insurance was required by Lender, <u>shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened</u>.
>
> [(Emphasis added).]

Section 5 then addresses the lender's right to hold the insurance proceeds during the repair and restoration period, pending a "prompt" inspection of the repair work:

> During such repair and restoration period, Lender shall have the <u>right to hold such insurance proceeds until</u>

A-0829-19

> Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.
>
> [(Emphasis added).]

Section 5 goes on to address the alternative scenario in which repairs either would not be economically feasible or where using the insurance funds to perform them would lessen the lender's security:

> If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.
>
> [(Emphasis added).]

The above-referenced Section 2 of the mortgage contract, titled "Application of Payments or Proceeds," prescribes the order of payment for applying the insurance funds:

> Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other

10

amounts due under this Security Instrument and then to reduce the principal balance of the Note.

. . . .

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount of, the Periodic Payments.

[(Emphasis added).]

The Foreclosure Litigation and Other Events

As the loan remained in default, plaintiff filed a mortgage foreclosure complaint against the Daws in March 2016, which the Daws did not answer. Consequently, default judgment was entered against them in June 2016.

Despite the plaintiff's filing of the foreclosure complaint, the Daws requested another loan modification to enable them to keep the house. Plaintiff denied the request because the Daws had insufficient income to be eligible.

The Daws continued to urge plaintiff to release the funds, in hopes of using a combination of the $150,000 RREM grant and the $150,000 in flood insurance proceeds to repair the house. In addition to the previously supplied RREM documentation, the Daws provided plaintiff with an itemized list of repairs needed to complete the home's restoration and their estimated costs.

11

Concurrently, Rushmore obtained in October 2016 a broker's price opinion ("BPO"). The BPO stated that the house was "in average condition" and that "as-is," in the next 90 to 120 days, the probable sale price of the house was $440,000, compared to $450,000 if the proposed repairs were completed. The BPO estimated the "as-is" list price of the home was estimated as $459,900, compared to $469,900 if the property were repaired. The BPO stated it was "unknown" if the property needed emergency repairs, and only noted the property needed exterior repairs costing slightly over $6,000.

In November 2016, the Daws filed opposition to plaintiff's first motion for entry of final judgment on the foreclosure, disputing the amount plaintiff alleged to be due on the mortgage.

Plaintiff's December 12, 2016 Letter to the Daws ("Repairs Not Economically Feasible")

While the motion for judgment was pending, the Daws received on December 12, 2016 an unsigned letter from Rushmore's Loan Mitigation Department. The letter advised the Daws that Rushmore had "determined" that using the insurance proceeds to repair the house was not a viable option. The letter read, in pertinent part:

> Based on one or more of the following facts, as stated below, Rushmore has determined that application of these insurance proceeds toward restoration or repair of

the real property is not economically feasible and/or would result in an impairment of its security interest in the subject real property:

- [Y]ou have vacated the real property,[7] or

- [Y]ou have made no alternative arrangements with Rushmore.

The letter continued:

. . . Rushmore may in it's [sic] sole discretion and without further notice to you, apply the insurance proceeds toward the outstanding loan balance on the above referenced loan, and either:

- Conclude it's [sic] foreclosure process on the real property and apply the sale proceeds to further reduce the loan balance;

- Write off the remainder of the loan balance and release its security interest in the real property; or

- Retain a security interest in the real property.[8]

[(Emphasis added).]

---

[7] The basis for this perception is unclear, and plaintiff has not argued on appeal that the Daws had, in fact, vacated the premises.

[8] The letter does not contain a signature or identify who at Rushmore issued or authorized it. The letter does provide a toll-free number to contact Rushmore with questions.

A-0829-19

Despite the December 12 letter's declaration of economic infeasibility, the Daws continued to resist the entry of final judgment and the loss of their home.

The January 30, 2017 Kops Certification ("Not Declared Economically Unfeasible")

Plaintiff responded to the Daws' motion opposition with a certification dated January 30, 2017 from Jared Kops, Assistant Vice President of Rushmore. In that certification, Kops attempted to explain the sequence of events and justify his company's position about the mortgage and the repair issues.

Oddly, in paragraph 16, Kops made the following sworn assertion:

> 16. Plaintiff has <u>not</u> declared these repairs economically unfeasible. Plaintiff is <u>entitled to retain the insurance proceeds held in escrow to apply to the repairs that are needed</u> to the subject property, starting with its elevation, and Defendants are not entitled to a credit.
>
> [(Emphasis added).]

Notably, the Kops certification omits any reference to his company's contradictory letter from the previous month.

The Court's March 3, 2017 Ruling

On March 3, 2017, the trial court issued an order granting in part and denying in part the Daws' objection to the entry of final judgment. The court found the Daws had adequately identified a discrepancy in the amount due on

14

the mortgage at time of foreclosure, because the $150,000 of insurance proceeds had not been deducted from the debt. Additionally, the judge noted that plaintiff had not approved the repairs, and therefore violated the contract by not carrying out either of the two specified options for the insurance proceeds. By granting in part the Daws' objection to the entry of final judgment, the court directed that, "if the . . . insurance proceeds are not applied to a repair, [] they're to be represented at [a foreclosure] sale as an available extra collateral or substitute collateral to go along with the sale of the property."

Further Negotiations, But No Agreement

Following the court's March 3, 2017 decision, the parties explored whether yet another loan modification agreement could be achieved. As those discussions were pursued, the court dismissed the foreclosure complaint in May 2018 for lack of prosecution.

The loan modification discussions in 2017 and 2018 ultimately were not fruitful. Although plaintiff was willing to extend the term of the mortgage, lower the interest rate, and make other concessions, it insisted on holding back $100,000 of the insurance proceeds as part of the deal. The Daws asserted the $100,000 holdback was unacceptable, as they needed the full $300,000 (the $150,000 RREM grant + the $150,000 insurance proceeds) to finance all the

15

necessary repairs and not lose eligibility for the grant. Despite this entreaty, plaintiff held to its position.

Final Motion Practice

Once the loan modification negotiations failed in the summer of 2018, plaintiff moved to reinstate the foreclosure complaint and for the entry of final judgment. The Daws opposed the motions, providing the court with a general contractor's slightly higher estimate of the costs of repairs, in the sum of $321,308. The Daws cross-moved for discovery and an evidential hearing to develop the record more fully. Their cross-motion also sought reimbursement of the $42,000 they had expended in emergency repairs following the Superstorm.

The Daws argued that plaintiff had unfairly held the $150,000 in insurance proceeds without a disposition of them for over three years. They calculated that if, hypothetically, plaintiff had promptly applied the insurance proceeds to the outstanding principal and interest when it received the funds in October 2015, the final balance due on the mortgage loan would have been about $40,000 less.

A-0829-19

<u>More Contradictory Correspondence from Plaintiff</u>

In the meantime, the Daws received more inconsistent communications from plaintiff.  On January 7, 2019, Rushmore's Loss Draft Department sent the Daws an unsigned letter about beginning the repair process, which appeared to clash with the pending motion for final judgment and how events had been actually unfolding.  The letter stated:

> As Rushmore Loan Management Services has a security [interest] in your property, <u>we want to ensure repairs to your property are completed in a timely manner</u>.  <u>We are here to work with you to facilitate the repair process</u>.  As the property owner, it is your responsibility to <u>keep us informed as to the status of those repairs</u>.
>
> Please contact us today at [tel. number omitted] to update us on the status of your repairs, to request an inspection if you are ready, or to discuss what is needed to release funds for repairs.
>
> [(Emphasis added).]

On March 7, 2019, Rushmore sent the Daws another unsigned letter, identical to the January 7 letter, seeking to facilitate the repairs of the premises and the release of the necessary funds.

Then, on March 26, 2019, Rushmore sent a letter to the Daws "formally retract[ing]" the March 7 letter about beginning the repair process, asserting it was sent "in error":

17 <span style="float:right">A-0829-19</span>

> This letter was sent in error and is hereby formally
> retracted.  The Loss Draft Department was not aware
> that the repairs to the subject property exceeded
> $321,000.00, an amount that is more than double that
> being held by Rushmore Loan Management Services,
> and that a Motion for Final Judgment was pending in
> foreclosure action under docket F-7529-16 applying the
> funds as a credit against Final Judgment pursuant to
> Court Order.[9]
>
> [(Emphasis added).]

This correspondence did not reference the January 7 letter, which presumably was also sent "in error."

### The Trial Court's Denial of the Daws' Claims for Reduction of the Final Judgment

After hearing oral argument, the trial court entered final judgment on September 9, 2019 in the full amount of $360,168.31 sought by plaintiff.  The final judgment applied the $150,000 in insurance proceeds to reduce the principal debt and interest, but not retroactive to the date when those proceeds had been received by plaintiff over three years earlier.

---

[9] Plaintiff's brief on appeal and its submissions to the trial court contained in the appendix do not explain why or how this error occurred.

In its oral opinion, the court rejected the Daws' arguments concerning both: (1) the disposition of the insurance proceeds; and (2) their claim for reimbursement for the $42,000 in emergency repairs.

As to the first issue, the court found the mortgage contract did not allow insurance proceeds to be applied to reduce the outstanding principal amount due on the loan during the period of time when the Daws were in default. Nor had the Daws sufficiently proven an equitable basis for such relief. The court pointed out that the Daws' long-standing expressed desire "to restore the property and to try to remain living there" was at odds with their current argument that the insurance funds should have been used to reduce the principal and interest at a much earlier date.

The court rejected the Daws' contention that plaintiff had acted unfairly. In this regard, it commented that plaintiff had taken "extraordinary steps" by offering a loan modification that might have enabled the Daws to remain at the property. The court was not troubled by plaintiff's demand in negotiations that $100,000 of the $150,000 in insurance proceeds be used to reduce the principal, as part of the overall terms of the loan modification.

As to the Daws' second claim, the court discerned no legal or equitable basis to justify compelling plaintiff to reimburse them for performing emergency

19

repairs of the property after the storm. The court found "nothing in the mortgage documents" authorized such reimbursement. In addition, the court noted the restorative post-storm improvements made by the Daws could potentially increase the price that the property might garner at a future sheriff's sale, that, in turn, would either increase any net equity in the property or reduce the amount owed in a final judgment.

The Appeal

This appeal by the Daws ensued. They continue their theme that plaintiff treated them unfairly. The Daws neither disclaim their liability for the delinquent debt, nor do they seek to vacate the foreclosure itself. Instead, they argue the final judgment must be reduced to take into account the substantial monetary adjustments for which they have advocated and which the trial court rejected.

Plaintiff opposes the appeal on both procedural and substantive grounds. Procedurally, it argues the Daws' objections to the amount of the final judgment are beyond the scope of challenges permitted under Rule 4:64-1(d)(3) because they go beyond the correctness of the amount due on the mortgage.[10]

_____

[10] We are satisfied that the Daws' arguments contesting the correctness of the judgment calculations, and their claims for offset relating to the accrued interest

Substantively, plaintiff maintains that the trial court correctly denied the Daws any reduction in the amount of the judgment.

II.

A.

We first address the Daws' arguments concerning the disposition of the insurance proceeds and the delay of over three years in applying them to reduce the mortgage principal and interest. In essence (albeit without labeling it as such), they assert a mortgage lender owes an implied covenant of good faith and fair dealing to the borrower when deciding how to apply such insurance proceeds. We adopt that legal premise.

It is well settled that "an implied covenant of good faith and fair dealing" inheres in "every contract in New Jersey." Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420 (1997); see also Restatement (Second) of Contracts § 205 (Am. Law Inst. 1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."). The implied covenant signifies that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the

---

and emergency repairs, are sufficiently germane and not procedurally barred under Rule 4:64-1(d)(3). Accordingly, we will devote our analysis to the substantive issues.

A-0829-19

fruits of the contract." Sons of Thunder, Inc., 148 N.J. at 420 (quoting Palisades Props., Inc. v. Brunetti, 44 N.J. 117, 130 (1965)). A party breaches the implied covenant when it exercises its contractual functions "arbitrarily, unreasonably, or capriciously" and with an "improper motive." Wilson v. Amerada Hess Corp., 168 N.J. 236, 251 (2001). "Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance." Ibid.

These general principles sensibly extend to how a mortgage lender or its assignee exercises its control over insurance proceeds received after a borrower's home has been damaged by a storm. The borrower is typically required under the mortgage contract, as in this case, to obtain property insurance and pay the premiums for that coverage. The insurance protects both the lender's security in the premises as well as the borrower's interests as a homeowner. The contract also typically specifies, as here, that if the insurer approves a borrower's claim for damage to the residence, the proceeds are to be held by the mortgage company. The mortgage company then decides if the insurance funds are to be used to repair the premises or instead used to pay down the mortgage debt. See Restatement (Third) of Property (Mortgages) ("The Third Restatement") §§ 4.7 to 4.8 (1997).

22

As we have already described, Section 5 of the mortgage contract in this case identifies two considerations that govern the lender's decision. If the lender concludes that repairs are (1) "economically feasible" and (2) will not lessen its security in the premises, then it must apply the insurance proceeds to fund those repairs. If, conversely, repairs are not economically feasible or performing them will diminish the lender's security, then the insurance funds should be applied to pay down the mortgage principal and interest. The decision is made by the lender, not by the homeowner. Yet, in making that critical decision, the lender cannot breach the implied covenant of good faith and fair dealing it owes to the borrower.

Section 5 does not delineate any factors to guide the lender's assessment of economic feasibility. The mortgage contract does not define the term. Even so, logic and common sense suggest that the economic feasibility and security impairment analyses must turn upon an objective consideration of facts, including but not limited to: (1) the estimated cost of repairs; (2) the reasonableness of the prices and quantities used in the estimate; (3) the market value of the premises in its present state before repairs are performed; (4) the projected increase, if any, in market value after such repairs are made; (5) the

length of time it will take to complete repairs; and (6) the existence and extent of any default by the borrowers and whether it was caused by the storm event.

The old adage, "Don't throw good money after bad," pertains. In some instances, it will be unreasonably expensive for certain repairs to be made with the insurance money, even if contrary to what the homeowner desires.[11]

The mortgage contract does not specify in Section 5 a time limit for the lender to make the decision about how to use the insurance funds. Obviously, the lender can't be required to decide whether to authorize repairs until it has been provided with the relevant information, such as market values and estimated repair costs. Upon receiving that data, a lender must make the decision within a reasonable time frame and not leave the homeowner in the dark. Significantly, Section 5 does instruct that if repairs are performed, the lender must inspect them "promptly." That language bespeaks a time imperative that logically applies to the whole decisional process.

---

[11] In this regard, comment b to the Third Restatement § 4.7 expresses an objective test. The comment describes the impairment of a mortgage company's security interest in property as being "the amount needed to return the mortgagee's loan-to-value ratio to the scheduled level—that is, the level that would have existed if all debt payments had been made when due and the real estate's original value had remained constant." Ibid.

 A-0829-19

Apart from these obligations of objectivity and promptness, the implied covenant of good faith and fair dealing also connotes that the lender will not act arbitrarily or capriciously, or purposely deprive the borrower of fair use of the insurance funds.

For example, if it were shown that the lender deliberately rejected a reasonable repair proposal as a means to reap for itself greater accrued interest, or as a scheme to wipe out a borrower's equity in the premises, such bad-faith conduct might justify a remedy by a court of equity. On the other hand, a lender should be free to protect its security and other business interests within the zone of fair competition.

We would expect and hope that instances of abuse will be rare. But the implied covenant of good faith and fair dealing can provide a mechanism to prevent injustice in such instances. In particular, a court of equity has the power to abate the accrued mortgage interest if the borrower proves the lender or its agent acted in bad faith with respect to the disposition of the insurance proceeds.

Another element of the implied covenant of good faith and fair dealing in this context is transparency and clear communication with the homeowners. We recognize the financial and emotional impact the uncertainty over how the insurance funds will be used is likely to have on many homeowners.

25

Accordingly, lenders and their assignees must convey their decisions and reasons concerning the disposition of insurance proceeds to homeowners with clarity and consistency.

Our application of the implied covenant in this setting comports with principles expressed in the Third Restatement as well as case law in a few courts that have pondered the subject.

Section 4.7(b) of the Third Restatement explains that:

> Unless the mortgage effectively provides the contrary, if restoration of the loss or damage [of the mortgaged real estate] is reasonably feasible within the remaining term of the mortgage with the funds received by the mortgagee, together with any additional funds made available by the mortgagor, and if after restoration the real estate's value will equal or exceed its value at the time the mortgage was made, the mortgagee holds the funds received subject to a duty to apply them, at the mortgagor's request and upon reasonable conditions, toward restoration.
>
> [(Emphasis added).]

This passage importantly reflects that the lender has a "duty" to act appropriately in its handling of the insurance proceeds, and that conditions it may impose on the use of the funds for repairs must be "reasonable." Ibid.

26

Comment a to Section 4.7 discusses the lender's interests in deciding whether the insurance proceeds will be used for repairs or to pay down the mortgage balance:

> Such funds are viewed as substitute collateral, and the mortgagee's claim on them is sometimes described as an "equitable lien." This means simply that the mortgagee is entitled to recover the funds to the extent necessary to compensate for the impairment of security that results from the loss or damage, with a maximum recovery equal to the balance owing on the mortgage debt. This result is required to avoid unfairness to the mortgagee through devaluation of the real estate as a consequence of the loss or damage.
>
> [Third Restatement § 4.7 cmt. a (1997) (Emphasis added).]

This comment appropriately recognizes the lender's own interests in the proper use of the insurance proceeds. Even so, the protection of those interests is to be guided by objective considerations of economic feasibility and lender security.

Comment d to Section 4.7 explains the policy underlying the economic feasibility condition in the mortgage contract and the "temptation" of lenders to take undue advantage of a borrower who may be in a vulnerable situation:

> The principle of this [] is that the mortgagee must cooperate with the mortgagor in restoration of the real estate if it is feasible to do so. It is common for real estate lenders to refuse such cooperation, particularly when market interest rates are higher than the rate on the mortgage loan in question. In this context, lenders

27

> are often tempted to seize upon the casualty loss or governmental taking as a basis for compelling a prepayment of the loan. Such a position may be extremely harsh from the borrower's viewpoint. Often the borrower cannot continue to occupy the real estate without first restoring the damage; hence, if the lender retains the funds paid in compensation for the damage, the borrower will have to find alternative financing for the property's restoration, either by way of a junior mortgage loan or by refinancing of the existing mortgage. Either of these alternatives will often result in a much higher interest cost to the borrower than use of the funds held by the lender. If restoration is feasible and involves no impairment of the lender's security, it is unreasonable for the lender to refuse to cooperate.
>
> [Third Restatement § 4.7 cmt. d (1997) (Emphasis added).]

The Restatement therefore stresses the importance of the lender acting "reasonably" and "cooperatively" if repairs are feasible. This comment also underscores a concern about what may be "extremely harsh" consequences for the borrower whose home has been damaged. In that vein, we note the New Jersey Legislature's declaration in the foreclosure context of "the public policy of this State that homeowners should be given every opportunity to pay their home mortgages, and thus keep their homes." N.J.S.A. 2A:50-54.

Like the drafters of the Third Restatement, we similarly endorse principles that promote fairness and reasonableness, and which guard against potential lender abuse. To advance these objectives, the implied covenant of good faith

A-0829-19

and fair dealing may be invoked by a borrower in appropriate circumstances to obtain redress.

Defendants cited to the trial court, and again on this appeal, two unpublished opinions from federal district courts of other jurisdictions, which have recognized similar principles in this setting, one of which expressly adopts the implied covenant of good faith and fair dealing. Although we refrain from citing those unpublished opinions in accordance with Rule 1:36-3, we note that plaintiff has not cited any contrary cases—published or unpublished—that renounce them.

We do find instructive a published appellate opinion from the New York courts on this subject. In Federal National Mortgage Association v. Azoulay, 93 N.Y.S.3d 423, 424 (App. Div. 2019), homeowner Azoulay executed a mortgage in 1998. In June 2007, the property was damaged by a fire, and Azoulay stopped making his mortgage payments a month later. Ibid. The insurance company issued two checks which were placed in a restricted escrow account and Azoulay obtained estimates of how much the repairs would cost. Ibid. By 2010, the repairs had not been completed, and the City of New York demolished the property. Ibid. In July 2008, Fannie Mae filed for foreclosure, and the foreclosure judgment was entered in March 2014. Ibid.

The appellate court in <u>Azoulay</u> agreed with the lender's determination that it was "not economically feasible to make the repairs or restoration, as the estimated costs of repair ranged from approximately 2.5 to 5 times the amount of the insurance proceeds, and the structure on the property was ultimately demolished." <u>Id.</u> at 425. Because of this, the court held that the insurance proceeds should "be applied to [Azoulay's] mortgage debt at or around the time of default." <u>Ibid.</u> This remedy resulted in a substantial seven-year reduction of interest, because Azoulay stopped making his mortgage payments right after the fire, in July 2007, and foreclosure did not ultimately occur until seven years later, in 2014. <u>Ibid.</u>

Although we concur with the New York court's provision of retroactive interest relief to Azoulay, we do not believe that the borrower's date of default is necessarily the proper date to use for determining when insurance proceeds should be applied to the mortgage balance. We instead hold that if repairs are objectively shown to be economically infeasible or would impair the lender's security, then the insurance proceeds must be applied promptly to the mortgage balance, unless otherwise agreed upon by the parties. "Promptly" in this context could mean at the end of the next billing cycle, or some other reasonable time

A-0829-19

frame, consistent with the overall implied covenant of good faith and fair dealing.

In addition, a mutual agreement of the parties to engage in loan modification negotiations should justify an extension of the lender's deadline to apply the insurance funds being held in escrow. If those discussions fail to produce an agreement, then the lender should act promptly.

As a final general point, it seems fair and appropriate for the insurance funds to be placed in an interest-bearing account until their disposition is finally determined. See R. 4:57-2(a) (analogously prescribing that escrow funds deposited in court shall be placed in an interest-bearing account, unless otherwise ordered). Such opportunity for the funds to grow, even at a modest interest rate, is preferable to the funds remaining dormant, because if the funds appreciate, that growth can be applied to either the resources available to finance repairs or to pay down the debt.

## B.

Plaintiff does not argue against the recognition of an implied covenant of good faith and fair dealing in this insurance proceeds context. Instead, plaintiff contends that the record in this case cannot be construed to support a theory that it breached any such covenant here.

A-0829-19

We appreciate the fact that plaintiff engaged in loan modification discussions with the Daws in 2018 after holding the insurance proceeds for several years, and that plaintiff reportedly offered the Daws substantial concessions in its proposal(s). On the other hand, it is not self-evident—either way—whether plaintiff's demand for the $100,000 holdback was fair, or whether it was patently unrealistic to believe that the Daws could do the necessary repairs to salvage their home without those funds and without violating the conditions of the RREM grant. The trial court should expressly consider whether the holdback demand was, as the Third Restatement discusses, an "unreasonable" condition. See Third Restatement § 4.7(b).

In addition, the repeated inconsistencies reflected in plaintiff's zig-zag communications we have quoted from above, and which were neither analyzed nor mentioned in the trial court's oral opinions, raise legitimate concerns for further exploration. The dissonance between the December 2016 letter declaring that repairs are not economically feasible, and Kops' contrary assertion in his certification a month later, has yet to be adequately reconciled. Similarly, the series of letters in January and March of 2019 from plaintiff encouraging the Daws to undertake repairs and then the sudden repudiation of that correspondence is also concerning, as an arguable pattern of mishandling and

miscommunication within the company. On remand, the trial court should review with a fuller record whether these were excusable bureaucratic lapses or instead persuasive evidence of a lack of fair dealing.

The trial court should also review whether the economic feasibility analysis ever occurred before the loan modification negotiations commenced, and, if it did, whether it was sufficient. The thoroughness and timeliness of the analysis should be examined by the court to determine if it comported with the implied covenant of good faith and fair dealing.

Additionally, the remand should explore whether or how the October 2016 BPO obtained by Rushmore bears upon the lender's economic feasibility analysis. In particular, the parties and the court should address the reliability of the BPO's opinion that the proposed repairs would only have marginally increased the property's "as-is" market value. The remand should also address whether that opinion should be treated as dispositive, given the ensuing passage of time and changes in the real estate market occurring after the Jersey Shore area recovered from the Superstorm. We also cannot tell from the present record whether plaintiff actually relied upon the BPO in whatever economic feasibility analysis it conducted before ultimately advising the Daws definitively that it would not approve the use of the insurance proceeds for repairs.

33

We are likewise mindful that the Daws themselves changed their minds at the end of the process and asked for the insurance funds to be applied retroactively to the mortgage principal and interest—after years of demanding to use those funds for repairs. This about-face by the borrowers, perhaps induced by plaintiff's insistence on retaining the $100,000, likewise must be factored into an overall assessment of the comparative equity between the parties within the totality of circumstances.

Rather than attempting on an incomplete record to apply the new standards we have announced today, we elect to remand the issue of the disposition of the insurance funds to the trial court. Further discovery must be allowed at the court's discretion to delve into what exactly occurred behind the scenes of the decision-making process, including but not limited to plaintiff's assessment of the economic feasibility of repairs and its security in the premises.

At the close of that discovery, the trial court shall conduct an evidentiary hearing to make credibility assessments and more specific fact-finding, consistent with the principles expressed in this opinion.

A-0829-19

## III.

We need not say much about the Daws' separate claim for reimbursement of the money they spent on emergency repairs immediately after the Superstorm. In brief, we agree with the trial court that the Daws have not provided a sound contractual, legal, or equitable basis to warrant being paid those sums by their mortgage lender. A mortgagor's duty to avoid waste does not carry with it a right to be paid for expenses incurred in restoring or preserving the property damaged by natural causes. See Third Restatement § 4.6 (noting the borrower's duty to avoid waste but not prescribing reimbursement by the lender).

In addition, we reject the Daws' assertions of their right to reimbursement under the doctrines of quantum meruit and unjust enrichment because their rights were already dealt with in the mortgage contract, see Kas Oriental Rugs, Inc. v. Ellman, 394 N.J. Super. 278, 286 (App. Div. 2007) (quoting Weichert Co. Realtors v. Ryan, 128 N.J. 427, 437 (1992)), and also because, as the trial court aptly noted, the emergency repairs they performed may have a positive impact on the sale price at an auction, which is potentially beneficial to the borrowers.

A-0829-19

All other points raised on appeal, insofar as we have not discussed them, lack sufficient merit to warrant comment. R. 2:11-3(e)(1)(E).

Affirmed in part, reversed in part, and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION